[No. S069959. July 16, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL BERNARD LEWIS, Defendant and Appellant.

COUNSEL

Tara K. Hoveland, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson and Mary Jo Graves, Chief Assistant Attorneys General, Gary W. Schons, Assistant Attorney General, William M. Wood, Holly D. Wilkens and Peter Quon, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

GEORGE, C. J.—A jury convicted Michael Bernard Lewis of the first degree murder of Patricia Miller (Pen. Code, §§ 187, subd. (a), 189), and found true the special circumstance that the murder was committed while defendant was engaged in the commission of a rape (Pen. Code, §§ 190.2, former subd. (a)(17)(iii) [now subd. (a)(17)(C)], 261).[1] The jury also found true the allegations that defendant personally used a deadly and dangerous weapon (§§ 1192.7, subd. (c)(23), 12002, subd. (b)) and that defendant previously had been convicted of a serious felony (§ 667). Following the penalty phase of the trial, the jury returned a verdict of death. Defendant moved for a new trial (§ 1181), and for modification of the penalty to life imprisonment without the possibility of parole (§ 190.4, subd. (e)). The trial court denied the motions and sentenced defendant to death. The court also sentenced defendant to an additional year in prison, consecutive to the death sentence, for the deadly weapon enhancement (§ 12022, subd. (b)(1)), added a five-year sentence, to be served concurrently, for the prior felony conviction (§ 667, subd. (a)), and ordered restitution in the amount of $10,000 (§ 1202.4, subd. (b)). This appeal is automatic. (§ 1239, subd. (b).)

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

# I.

# FACTS

A. *Guilt phase evidence*

1. *The prosecution case*

a. *Summary*

In the morning of August 2, 1991, Patricia Miller was found dead on her living room floor, with her pants pulled off, her shirt pushed up, and her throat slashed. Defendant had flirted with Miller early the previous evening, had visited her apartment later that evening, and was the last person seen with her. He gave numerous conflicting accounts of his activities on the evening of August 1, initially denying that he had been in Miller's apartment, and eventually admitting that he had sex with Miller in her apartment that evening. He was unable to provide police detectives with a credible account of his activities and whereabouts during the four-hour period following his last admitted contact with Miller, and his description of the events conflicted with the accounts provided by other individuals. Four years earlier, defendant had assaulted and raped an acquaintance when he visited her at her apartment late in the evening. Details of the prior assault and rape were similar to the murder and rape of Miller.

b. *Defendant's activities on August 1 and 2, 1991*

Patricia Miller resided in a two-story apartment building on Republic Street in Moreno Valley with her daughter Danyelle, 13 years of age, and her son Demetreus, five years of age. Directly to the east was a similar apartment building where Brian Jones resided. Directly east of Jones's building was a third apartment building, where Dwayne Mitchell resided. Along the rear of the apartment buildings was an alley running parallel to Republic Street to the north and Alessandro Boulevard to the south. Between the apartment buildings were walkways from Republic Street to the alley. Across the alley from Jones's and Mitchell's buildings, between the alley and Alessandro Boulevard, was a liquor store.

Jones testified that in August 1991, it was his custom to socialize with friends in the carport area behind his apartment building. He testified that frequently persons walked through the walkways and the alley, especially on the first and 15th of any month, because residents of the neighborhood went to the liquor store to cash their checks. In addition, according to Jones, some

individuals took these routes to purchase illegal drugs from dealers who frequented the area around the liquor store.

Jones related that sometime after 4:00 p.m. on Thursday, August 1, 1991, his friend, David Hargrove, accompanied by defendant, arrived to visit with Jones in the carport area.[2] Defendant was wearing a white T-shirt, white shorts, white socks, and white sneakers. Jones testified that defendant told him he was leaving California that night or the next morning. According to Jones, defendant was "putting the moves on everything that moved." He testified that as women walked through the alleyway, defendant made comments such as, "I am going to fuck me something tonight, before I go," "I kind of like to fuck that bitch," and "I like to get with that hoe." Defendant sometimes yelled comments or whistled at women as they passed.[3]

According to Jones, at approximately 8:00 that evening, the victim, Patricia Miller, walked through the alley, from the liquor store to her apartment. Miller was acquainted with Jones, and she stopped to socialize briefly with the group in the carport. Jones testified that defendant called Miller aside, whispered in her ear, and conversed with her for approximately 10 minutes. Jones also testified that he and Hargrove "laughed off" defendant's advances toward Miller, because defendant was "wasting his time." According to Jones, defendant commented after his conversation with Miller that he "wouldn't mind getting some of that."[4]

Hargrove testified that at approximately 8:30 or 9:00 p.m., before it became dark, he gave defendant a ride to visit a friend of defendant's who resided in a nearby neighborhood. Jones testified that 30 or 40 minutes after Hargrove and defendant left the carport, Jones saw defendant walking down the alley. Jones testified that he noticed defendant was exhibiting symptoms consistent with a person who had used rock cocaine, and he described defendant as "all jacked up."[5]

---

[2] Jones testified that Hargrove and defendant arrived "right after four," but that when he spoke to an investigator, "I guess I told him [that Hargrove and defendant arrived that evening at] seven or eight [o'clock]." Hargrove testified that he and defendant arrived at approximately 6:00 p.m.

[3] Hargrove testified that he did not hear defendant make any disrespectful comments to or about women.

[4] Hargrove testified that defendant's conversation with Miller was short in length— approximately 30 seconds—and that defendant did not say anything "offensive" about Miller, nor anything "to disrespect her."

[5] Dwayne Mitchell smoked crack cocaine with defendant that evening. Mitchell testified that on that same day, August 1, he had moved into an apartment building next to the one in which Jones resided. While it still was light outside, defendant, who was acquainted with Mitchell, brought some rock cocaine to Mitchell's new apartment and they smoked it together. According to Mitchell, during that visit or perhaps during an earlier conversation, defendant

The testimony of Miller's daughter, Danyelle, established that, after returning to the alley, defendant visited Miller at her apartment. Danyelle testified that her mother called her inside between 9:00 and 9:30 p.m., by which time Danyelle's brother already was asleep in their mother's bed. Danyelle testified that she came inside and went to sleep, but was awakened approximately 30 minutes later by a knock at the door of the apartment. She explained that her bedroom window was above the door to their apartment and overlooked the walkway between their building and the apartment building directly to the west. She testified that, through her window, she inquired who was there, and the person at the door responded, "Mike."[6] Danyelle testified that she told her mother, who was in the upstairs bathroom, that "Mike" was at the front door, and her mother responded, "Tell him to hold on." Danyelle relayed the message to the visitor through her window. She testified that before she fell asleep again, she heard her mother and the visitor talking, and saw her mother through her bedroom window, walking outside with the visitor toward the laundry room in the back of the apartment building. Danyelle also testified that some time later, she was awakened again when her mother heard gunshots and called upstairs to Danyelle to close her bedroom window.

Dwayne Mitchell also heard the gunshots in the alley that evening, estimating the time at between 10:00 and 10:30 p.m. Mitchell testified he was walking to a telephone booth at the east end of the alley when he heard the shots and encountered defendant in the alley, walking back from the telephone booth in the direction of Mitchell's apartment building. Defendant was alone at that time. Mitchell testified he next saw defendant at approximately 11:00 that evening, when defendant and Miller walked past Mitchell's bedroom window, along the walkway between Mitchell's and Jones's buildings, in the direction of Republic Street, where cocaine sometimes was sold.[7] Mitchell did not see defendant again until approximately 3:00 a.m. on August 2, when defendant returned to Mitchell's apartment to spend the night.

Virginia Turner testified she was employed at a taxicab dispatch office in a commercial building situated on the east side of the liquor store. She was at the dispatch office from 8:00 p.m. on August 1 until 8:00 a.m. the next

---

asked Mitchell whether he could stay at Mitchell's apartment that night, and Mitchell agreed. Mitchell testified that after they smoked together, defendant left the apartment.

[6] Danyelle testified that her mother did not have a boyfriend, was not in the habit of bringing men into the apartment during the nighttime hours, and did not have men spend the night at the apartment. She was unaware of anyone coming to the apartment the evening of August 1 other than the person who identified himself as Mike.

[7] Mitchell testified he knew Miller because he had been inside her apartment once with a friend who was using the apartment as a location to "cut up" cocaine for sale. In exchange for the use of the apartment, they had given Miller some cocaine. Mitchell testified he was unaware of Miller's ever having performed sexual favors in exchange for cocaine.

morning, and from her window, which she faced while she worked, she had a clear view of the alley and the rear of the apartment buildings. According to Turner, sometime between 11:00 p.m. and midnight, she received a telephone call from defendant, who asked whether she knew where he could obtain some cocaine. She responded that she could not obtain any for him at that time. Approximately five minutes later, Turner testified, she saw defendant come out of the walkway by Miller's building and walk down the alley, in the opposite direction from Turner's office. After another five minutes elapsed, she saw defendant return up the alley and into the walkway by Miller's building. She explained it was easy to see defendant because he was dressed in white clothing.[8]

Turner testified that the next time she saw defendant was when he emerged from the walkway by Miller's apartment at approximately 2:00 a.m. and turned into the alley. She related that he walked quickly to Turner's office and told her he needed a taxicab immediately. Turner responded that her sole driver was "out on a run," and that defendant would have to wait 10 or 15 minutes. According to Turner, defendant said that he could not wait, and that he would go to Mitchell's house to see whether Mitchell was awake. Turner testified that during the time defendant was at the taxicab office, she observed that he exhibited symptoms of having smoked cocaine; he was jittery, nervous, and sweating. She stated that he was wearing white clothing, and that she did not notice any blood or other marks on him.

Mitchell testified that defendant knocked on his door between 2:00 and 2:30 a.m. Mitchell was certain defendant did not appear at his apartment earlier, because the family of Mitchell's girlfriend had visited the apartment from 11:00 or 11:30 p.m. until approximately 2:30 a.m., and defendant was not present at any time while the relatives were at the apartment. Mitchell testified that when he admitted defendant to the apartment, defendant was wearing the same clothes as earlier, and he "crawled over on the floor and went to sleep." Mitchell stated that he and defendant awoke on August 2 between 8:00 and 9:00 a.m., and left Mitchell's apartment approximately 30 minutes later. The two men walked together toward the neighborhood where Mitchell previously had resided. According to Mitchell, defendant seemed concerned only about meeting his brother and departing from California on their trip.

---

[8] Turner confirmed that the alley, which was known as "rock alley" due to the availability of rock cocaine, was relatively busy on August 1. She estimated that approximately a dozen individuals traveled from Republic Street to the alley through the walkway by Miller's apartment building, and another dozen traveled from Republic through the walkway by Mitchell's apartment building. Approximately the same number traveled in the reverse direction. She clarified that some of the trips were made by the same persons walking back and forth.

Defendant's brother, Kenya McAllister, testified that he met defendant between 9:00 and 10:00 a.m. near their parents' prior residence, and they departed on their trip. According to McAllister, defendant's attitude was normal and he did not appear to be upset. McAllister also testified that defendant did not mention being with a woman or having sex the previous evening.

### c. Discovery and investigation of the crime scene

Danyelle awakened at 6:00 a.m. on August 2, when she heard her mother's alarm clock. She walked to her mother's bedroom, but only her brother, Demetreus, was in her mother's bed. She proceeded downstairs to look for her mother, and found her lying on the living room floor with her pants down, her shirt up, and blood surrounding her. Danyelle shook her mother to awaken her, but her mother did not move. Danyelle ran to a neighbor's home and reported that there was something wrong with her mother. When Danyelle exited from the front door, she observed that the lock within the doorknob, which could be engaged by a person exiting from the apartment before the door was closed, was locked, but the deadbolt lock, which could not be locked unless the door was closed (and therefore required a key to be locked from the outside), was not locked. The neighbor returned with Danyelle and, after attempting to feel a pulse in her mother's body, informed Danyelle that her mother was dead.

Law enforcement officers arrived at Miller's apartment at approximately 7:00 a.m. on August 2. After the officers searched the apartment for suspects and cordoned off the crime scene, Deputy John Monarrez of the Riverside County Sheriff's Department interviewed Danyelle concerning the events of the prior evening. Monarrez testified that Danyelle informed him that she knew the visitor only as "Mike," and she disclosed that she had seen Mike speak to her mother and visit their apartment on other occasions. She also told Monarrez that Mike was wearing a white T-shirt and tan pants. Monarrez asked Danyelle to compare the color of Mike's pants to pants worn by people milling in the crowd, and she identified a color that Monarrez described in his report as "beige," which he believed to be lighter than "tan."[9] Monarrez also asked Danyelle to compare Mike to other persons in the area and, based upon those comparisons, Monarrez determined that Mike was an African-American man, approximately 30 years of age, six feet in height, and weighing 175 pounds.

Marc Bender, an investigator with the Riverside County Sheriff's Department, inspected the crime scene. He testified that he found no blood trail leading away from Miller's body, and no blood on the doors, walls, or floor,

---

[9] At trial, Danyelle testified that Mike was wearing long beige slacks.

other than underneath the body and within a few inches of it. He also testified that there was a large wound that cut into some of the major arteries in the victim's neck, but the blood was confined to a small area around the victim. Bender explained that the absence of splatter or spray of blood indicated to him that the "automatic thrashing reaction" that, according to Bender, almost always results from such an injury, had not occurred, nor had the victim aspirated blood and exhaled a spray of blood. Photographs of the crime scene reflected that the victim's arms extended upward on the floor, her forearms were bent inward, and her hands lay in close proximity to each other at the top of her head, with the fingers of her right hand touching her left wrist. Bender noted that there was little blood on the victim's hands, indicating to him that she had not reacted by grabbing at the wound as, he explained, victims of such wounds often do in response to pain or to stop the flow of blood. He also noted that the edge of the bloodstain on the floor was almost straight and ended where the victim's back came in contact with the carpet, indicating to him that any movements on her part after her throat was cut were minimal.

Bender noted, and photographs of the crime scene reflected, that the victim's pants had been pulled off, except for the bottoms of the pants legs, which apparently caught around the victim's ankles. The pants extended away from her feet, and were inside out. Her left leg was straight, but her right knee was bent sharply, causing her right foot to rest at a point even with her left thigh and knee. Her right foot was some distance from her left leg, and her right knee leaned inward toward her left thigh. Bender noted, and photographs from the crime scene reflected, a smear of blood on her right hip, and Bender surmised that someone had wiped blood from his or her hands onto the victim's hip, leaving a pattern that looked like fingers. He testified that on her arms were similar smears of blood that appeared to have been made by a hand. Finally, he testified that there were smears of blood on the carpet, and that one of the smears was pointed and appeared possibly to have come from the tip of a knife.

Bender testified there was no sign of a struggle having occurred in the apartment. The downstairs window had bars, and a sliding door to a patio area behind the building had a deadbolt lock in place, indicating to Bender that the perpetrator left through the front door. He testified that no murder weapon was found. Bender testified that he suspected the perpetrator had washed his hands before leaving, but no evidence of blood was found in any of the apartment's sinks. He also testified that fingerprints found on objects in the apartment's living room and kitchen, and in the laundry room, either matched the victim's or lacked a sufficient number of points of reference to compare to other known prints.

Bender testified that he asked persons in the area about "Mike," and was directed to Brian Jones, who described defendant the same way he described him later at trial—"all jacked up," "very excited," "hitting on everything that moved," and "bound and determined to get between somebody's legs that night." Bender learned defendant's last name from a former neighbor of defendant's, who also disclosed that defendant had moved out of the house one day earlier. Bender conducted a search for defendant's name in a law enforcement computer system, and determined that defendant was on parole. Bender contacted defendant's parole officer and learned that defendant recently had requested permission to leave California and move to North Carolina.

Paul Sham, a criminalist, also examined the crime scene on August 2. He testified that he detected no bloodstains on the front door, the tile floors, the interior walls, the ceiling, or on any objects; blood was found only on the body and immediately surrounding the upper portion of the body. He explained that blood "smears" result from contact with a bloody object, in contrast to blood "splatter," which is caused by the deposit of airborne blood droplets. Sham testified that he observed blood smears on the victim's right calf, right buttocks, right hip, abdomen, upper arms, both hands, forehead, both cheeks, and around the eyebrows. He also testified that he observed blood splatter on the front of the victim's blouse, which appeared to have originated from the area of her throat. Sham also noted blood splatters on her abdomen, extending down to her pubic area. Sham stated that he examined the downstairs bathroom sink and the kitchen sink, and found no evidence of blood. He also stated the windows facing the front of the apartment were barred, the sliding glass door was locked, and the front door was locked from the inside. Sham testified that he found no obvious signs of a forced entry or a struggle.

### d. *Defendant's conduct and statements after leaving California*

David Hargrove testified that approximately two days after the commission of the crimes, defendant contacted him by telephone at Hargrove's home. According to Hargrove, defendant told him that he was in El Paso, Texas, and Hargrove told defendant that "he needed to come back to California because word had it that he was involved in a murder." Hargrove testified that defendant responded that he did not know "what was going on," but that he would return to California. Hargrove also testified that defendant contacted him a second time to let him know he had reached Chicago, but the two did not discuss the homicide. Defendant's brother, Kenya McAllister, testified that during the trip to Chicago, defendant did not mention to McAllister that he had spoken to anyone in Moreno Valley, that he was a witness to or a suspect in a murder, or that it would be necessary for him to return to Moreno Valley.

Bender, the investigator, testified that he attempted to locate defendant through the parole system and subsequently was contacted by defendant's father, who informed Bender that defendant would return to California. Bender arranged to interview defendant on September 3, 1991, at a detention center in Riverside. Bender and a second detective, Dan Wilson, were present during this interview, which was recorded, except for several minutes when the first side of the tape ended and the cassette was not turned over promptly. Bender testified that in March 1992, he noticed that Wilson's report concerning the interview did not include all portions of it. At that time, Bender prepared a supplemental report describing the omitted portions of the interview, but he did not learn until January 1998 that a portion of the interview had not been recorded. Transcripts of the recorded portion were provided to the jury, and the recording was played at trial. Bender testified concerning the unrecorded portion of the interview.

The transcript of the Riverside interview reflects that Detective Wilson began by informing defendant of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*). Defendant confirmed he understood these rights, and that he was willing to speak with the detectives and provide a sample of his blood. The recording was paused while a nurse took a blood sample. When the recording resumed, Detective Wilson asked, "you were saying something about you talked to somebody?" Defendant responded that he had spoken to a friend, who said defendant was "a witness," and that the friend stated he had "tried to catch me the day I left. You know, going to Charlotte, North Carolina." Defendant told the detectives that his parole officer had directed him to return to California, and that when he returned, the parole officer informed him that the detectives wished to speak with him. Wilson asked defendant whether he knew "what this is in reference to," and defendant responded, "I understand a 187," presumably referring to section 187 of the Penal Code, which defines murder. When asked whether he knew who the victim was, defendant responded, "I know a, Patricia. They called Pat . . . ."

Defendant told the detectives that he had spoken to Miller at approximately 8:00 p.m. or 8:30 p.m., asking her, " 'how you doin'?' She told me she . . . was just gettin' off a motorcycle with some guy which I do not know, who was sittin' there drinking a beer. [A]bout five minutes later he told me, 'Man let her go, get home.' I let her go."[10] When asked whether he had been at Miller's house that evening, defendant stated he "passed by" her house and asked her whether her son had told her that "I asked about you that

---

[10] Subsequently, during the same interview, defendant described the motorcycle as being some distance away, and attributed the motorcyclist's comments instead to David Hargrove. At this subsequent point in the interview, defendant stated, "I'm like maybe 30, 40 feet away. I'm half drunk. I wasn't payin' no attention. I know I seen her, I looked, then when I seen her

Saturday." Defendant said Miller told him that her son had not delivered this information, and defendant then "went on." He added that he saw Miller later in the evening and spoke to her again. When asked when he last had seen Miller that evening, defendant stated he saw her as she was going to the laundry room, at approximately 10:30 p.m. When Detective Wilson began to ask him about "when [he] was over at Pat's house about 10:00, 10:30," defendant interrupted to say that he "wasn't at her house." Defendant added, "I stopped there, goin' through that way." He stated he helped her carry her clothes, and they conversed at the laundry room. As he was preparing to leave that room, he and Miller heard gunfire, and they both "ducked down." Defendant claimed he then went to Mitchell's home, staying until approximately 2:00 a.m., at which time he went to the taxicab office. When he was unable to arrange for a cab ride, he returned to Mitchell's home, where he stayed until 8:00 a.m. on August 2, when he left to meet his brother to drive to North Carolina.

The transcript reflects that defendant then changed his narrative. He stated that after he left Miller, he went to a service station and purchased some cigarettes, and then spent some time in the alley with a man named Reese. When he left Reese, he went to the taxicab office and then to Mitchell's apartment. When Wilson asked defendant whether Reese could vouch for defendant's time that evening, defendant stated he was with Reese "maybe ten or fifteen minutes. Maybe less than that." Wilson then observed "there's about a four hour period of time . . . from the time you last saw [Miller] to the time you was with—" Defendant interjected, "I went back to [Mitchell's] house, when I left [Miller's], I left [Miller] right after the shootin' and shit, I left [Miller]. I went back to [Mitchell's] house. Then I left again. I left again. Then, I messed around, like I said, I went to the gas station. Four hour period? Where does the four hour period come in?" Wilson explained that defendant last saw Miller at approximately 10:00 or 10:30 p.m., and appeared at the taxicab office at approximately 2:00 or 2:30 a.m. Defendant responded, "I was probably getting' high or somethin'."

When Wilson asked whether defendant had seen anyone else at or around Miller's apartment that night, he responded that there were "some guys standin' out front that I don't know." Wilson inquired whether defendant had gone to Miller's apartment immediately before helping her on her way to the laundry room, and had walked back to her apartment from the laundry room. Defendant responded, "When I was comin' through, she was comin' out." Wilson asked whether defendant knocked on Miller's door and asked to see her. Defendant responded that he had knocked "earlier that evening," and

---

again, she was walkin' toward the liquor store. When she come back through I called her. I said, 'What's up, Pat?' You know. David said, 'Man, let that girl go ahead on.' I let her go. That was that."

Miller's son had answered the door. Defendant also stated he did not know where Miller went after he left her at the laundry room.

Wilson asked defendant whether he ever had been inside Miller's apartment. Defendant responded he had been there approximately one month before her murder, when he went there to see whether she cared to come outside to drink beer. According to defendant, she had declined, but he had visited inside her apartment for 10 or 15 minutes. When Wilson returned to the subject of the time defendant had spent with Reese, defendant stated that Reese had been looking for drugs, but that defendant had not, adding, "I don't mess with cocaine." When Wilson inquired whether defendant had "ask[ed] anyone about anything," defendant stated, "I asked one guy for my friend Mike." (It is not clear who "Mike" was.) Defendant also stated he did not know how his name came up in this matter, because he did not like Black women.

When defendant asked the detectives how Miller was killed, they declined to respond. Returning to the subject of the four-hour period, defendant stated he had smoked some marijuana, spent some time with Reese, and gone to Mitchell's apartment at 11:00 p.m. Then, "I left, went to the cab company. I then went and got me some cigarettes. I went to the cab company." He urged the detectives to "[a]sk Jenny [Turner]. 'Jenny, I ain't got no money. I need a ride out JFK and Kitching.' I said 'I'm gonna see can I spend the night at my partner's house first.'" Defendant then stated that Mitchell agreed to allow defendant to stay at his apartment, and defendant stayed there until 8:00 a.m. the next day.

Defendant told the detectives that when he called David Hargrove while traveling to Chicago, he asked Hargrove what crime defendant was suspected of committing, and Hargrove informed him that Miller had been killed. Defendant stated he was cooperating to clear his name, and "[b]ecause I'm tryin' to get off this parole." When Bender commented that defendant had "been through the drill a couple of times," defendant disagreed, stating: "Last time when I caught this rape case, I took a deal for somethin' I didn't do because my lousy friend wouldn't come to court to testify for me." Bender stated that "one problem is that when I talked to [Mitchell]—" and defendant interjected, "I already found out. I heard. That he said I didn't spend the night at his house." Defendant claimed Mitchell was lying, because Mitchell had been "jumped on" the day that Miller's body was discovered, "just 'cause I knew him."[11] Returning to his telephone conversation with Hargrove, defendant told the detectives that he asked Hargrove what time Miller had been

---

[11] After Miller was killed, Mitchell was beaten by a man whom Mitchell had accompanied to Miller's apartment to "cut up" drugs. The man was assisted by two others, and Mitchell required hospitalization.

killed, and Hargrove stated, "Sometime that night." According to defendant, he responded to Hargrove, "That night? I'm at [Mitchell's] house." Defendant then told the detectives, "11:00, I'm at [Mitchell's] house, for a while. And after while I get some cigarettes 'cause uh, he was in there basing cocaine." Defendant asserted that "a person on cocaine will say anything to save his ass, keep his name out of it." At this point in the interview, the first side of the recording tape ended.

After the jury heard the first side of the recording, Bender testified concerning the unrecorded portion of the interview. He testified that he falsely told defendant his fingerprints had been found inside Miller's apartment, and defendant attributed the fingerprints to his visit to the apartment one month prior to the crimes. Bender testified that he then falsely asserted that fingerprints would not survive for that period of time. According to Bender, defendant then told him that when he had knocked on Miller's door earlier on August 1 and had spoken to her son, he had gone into the kitchen to get a glass of water, but that was the only time he had been in the apartment. Bender further testified that later in the unrecorded portion of the interview, defendant stated he also had been inside the apartment at approximately 8:30 that evening and he drank a beer with Miller.

Although genetic testing had not yet been performed, Bender told defendant, during the unrecorded portion of the interview, that defendant's sperm had been found in Miller's vagina. Bender testified that defendant "looked down at the floor for what seemed like a long gap at the time, probably, 10 or 15 seconds, and then he looked up at me, and then he started to tell me another story." Bender testified that defendant stated he had not disclosed some facts to Bender earlier, because he did not want to be found in violation of his parole. Bender testified that defendant "then admitted he had gone into the apartment, that he had smoked rock cocaine with the victim, and that he and the victim had had sex." According to defendant, Miller became aroused, took her clothes off, pulled defendant's pants down, got on top of him, violently copulated with him, got off him as soon as he ejaculated, put her clothes back on, and left to do laundry. Defendant told Bender that he remained slouched on the couch and passive throughout their encounter, which occurred at approximately 8:30 p.m., soon after Miller had returned from the liquor store. At this point in the interview, it was discovered that the cassette tape had reached the end and no longer was recording.

The transcript reflects that when the recording resumed, Wilson stated that "you were sayin' a while ago that . . . somebody in the area told you that . . . her throat had been cut?" Defendant responded, "Yeah." Wilson inquired, in light of defendant's statement, why defendant had asked how Miller was killed. Defendant responded, "That's what I'm tryin' to find out, was it really

true. Like you say, you didn't wanna give me no answers, I didn't wanna know, I didn't wanna know if it was true or not. 'Cause like I say, at first when the first thing jumped up, I'm a witness." Bender responded, "Yeah." Defendant added, "Me and [Hargrove]. So I figure the mother-fucker was lying." Bender responded, "Yeah." Defendant continued, "You said her throat was cut. See what I'm sayin'? [J]ust like, [Hargrove] didn't know what was really goin' on." Bender responded, "Uh-huh." Defendant completed his explanation, stating, "You know what I'm sayin'? He was tellin' me man, yeah, uh, then [Mitchell] come in and kept sayin' about how your name got twisted all up into this here. It's [Jones]." Bender responded, "Yeah."

The interview returned to the subject of defendant's sexual encounter with Miller, and defendant reiterated that the sex occurred prior to the conversation in the laundry room. Bender expressed the view that the sexual encounter occurred after they met in the laundry room, and defendant asked, "what did I tell you?" Bender responded, "You told me that it was . . . definitely before—" Defendant interjected, "Was it before? It was before then." Bender stated, "No, it's after," and defendant responded, "It was after." Bender then explained that it did not make sense that the sexual encounter occurred earlier, when Miller's children were awake. Defendant then stated that "I made love right, what, around 9:00, 10:00," and that the gunshots occurred later, "[a] little after 10:00." Defendant estimated that approximately 20 minutes elapsed between the time he left after having sex with Miller, and when he returned and went to the laundry room with her. He stated that when the shooting began, he left her; he met Reese and spent 10 to 15 minutes with Reese; he arrived at Mitchell's home "way before 10:30 [p.m.]" and stayed at Mitchell's home "for a few hours," and then left. When Bender inquired whether Mitchell or anyone else knew that defendant and Miller had sex, defendant responded that his sex life was nobody's business. Defendant added, "I understand what you're sayin', but what was you tryin' to get at? No. I did not rape [Miller]."

Defendant then volunteered that Miller's daughter had not seen him, but her son had come downstairs complaining that his stomach hurt, and defendant had gone to an automobile service station to buy the boy a soda. Bender asked defendant when it was that he had gone to the service station, and defendant stated, "right after we had sex. That's when I left, matter of fact, that's when I left." Bender asked defendant again to estimate when he went to Mitchell's home, and defendant stated he had arrived at Mitchell's "about ten somethin'. Something, 11:00. I ain't quite sure." Bender then asked defendant why, when Bender asked whether defendant had made love to Miller, defendant "came up with this rape thing." Defendant stated that Hargrove had told him that Miller's throat had been cut and she had been raped. Bender responded that "I spent all day in that apartment and I didn't know she was raped." At the conclusion of the interview, Detective Wilson

explained to defendant that he would not be held, and that defendant's parole officer would determine whether he would be allowed to return to Charlotte, North Carolina.

Eight months later, on May 1, 1992, Bender interviewed defendant a second time, at the office of his parole officer in North Carolina. Bender explained in court that the interview was recorded, but the recorder was in a drawer while the first side of the tape recorded, and that part of the recording was unintelligible. Therefore, Bender testified concerning the contents of the unintelligible portion of the interview. He testified that defendant was not under arrest at the time of the interview. He also testified that he informed defendant of his rights under *Miranda, supra,* 384 U.S. 436, and that defendant said he understood those rights and would speak to Bender.

Bender testified he informed defendant that Mitchell and Mitchell's girl-friend were certain defendant had not arrived at their home until approximately 3:00 a.m. on August 2. Bender related that defendant initially was adamant that he had been at their home at 11:00 p.m. on August 1, but after Bender explained that Mitchell and his girlfriend had had company that evening and were certain defendant had not been present when the company visited, defendant stated he may have been out wandering in the neighborhood between 11:00 p.m. and 3:00 a.m. Bender also testified that during this second interview, defendant said it was "closer to about 11 o'clock in the evening," after the laundry was completed and gunshots were heard in the alley, that he and Miller had returned to her apartment, smoked cocaine, and had sex.

Bender testified that when he confronted defendant with inconsistencies in his statements, defendant "got kind of agitated and said that I was trying to screw him up, that I was trying to trip him up . . . ." Bender testified that "[a]bout that time, [defendant] remembered or brought up something that he hadn't talked to me about before." Defendant told Bender that just as he was leaving Miller's apartment at approximately 11:00 p.m., another man entered the apartment. Bender testified that defendant said the other man resembled Bender but was taller, thinner, and African-American.[12] The intelligible portion of the recording began when defendant was describing the other man. The recording was played for the jury. The transcript reflects that defendant told Bender that Miller seemed to know the man, but that she did not state his name. Defendant also said that the man stumbled into Miller's apartment, was "all drunk," and sat on the bottom step of the interior staircase. Part of defendant's description was unintelligible, but Bender testified that defendant

---

[12] Bender testified that in his experience, when a suspect falsely claims another person was present, the suspect usually describes the person as being similar to the interviewer or the suspect.

stated the intoxicated individual could not stand without leaning against the banister or the wall, and had difficulty sitting up. The transcript reflects that defendant also told Bender he previously had seen the man in the neighborhood, but the man always was by himself, and defendant did not know anyone with whom the man associated.

The transcript reflects that defendant agreed with Bender that it would have been logical to mention this other person when defendant first was questioned about Miller's death, and defendant stated that he thought he had mentioned the other person to Bender during the first interview. At trial, Bender was certain defendant had not mentioned the other person earlier. Bender also noted at trial that in the earlier interview, defendant had denied that anyone else was at the apartment, and when Detective Wilson had commented in the earlier interview, "apparently somebody else after you saw her alive," defendant had responded, "I guess." Defendant also stated in the earlier interview, "I don't know whoever, whatever, whoever was there when I left, I don't know what happened." Bender testified that he did not investigate the existence of the intoxicated individual, because he was certain defendant was not being truthful. At the conclusion of the interview, Bender arrested defendant for the rape and murder of Miller.

### e. *The autopsy*

Robert DiTraglia, a medical doctor and forensic pathologist, performed the autopsy. He testified that Miller was five feet, two and one-half inches in height and weighed 111 pounds. He described the cut to her throat as "a very large wound that covered pretty much the entire front portion of her neck." He testified that when he first viewed the wound, it had "this huge gaping appearance that measured, approximately, 10 centimeters from one end to the other." He stated that the wound appeared to have been inflicted by two cuts, one on each side of the neck, with one overlapping the other. One cut was 7.4 centimeters in length, and the other was 6 centimeters in length. He added that, alternatively, the wound may have been caused by a single cutting motion across the throat, in which the knife was raised and pivoted midway through the cut. DiTraglia explained that the cut severed the right external jugular vein, and injured muscle, cartilage, bone, and the airway in the victim's neck. He testified that Miller's heart was beating when the wound was inflicted, which caused hemorrhaging into the tissues, and that this wound was fatal. He explained that because the major blood vessel that was severed was a vein rather than an artery, the blood would not spray out of the cut, but blood might spray from the airway if the victim was breathing strongly.

Dr. DiTraglia testified that he also found evidence of strangulation, including hemorrhaging on the superior portion of the thyroid gland and fractures

of the laryngeal cartilages. He noted that petechial hemorrhages on Miller's eyes and eyelids were further evidence of strangulation. He testified that "severe compressive force" is required to cause such fractures, and agreed that such injuries could be caused by strangling a victim with fingers behind the neck and thumbs in the front on the center of the neck. He stated that a victim of strangulation will lose consciousness within six to 15 seconds if the vascular structures are occluded. He opined that a victim will suffer irreversible brain damage after 60 seconds of vascular occlusion, but noted that the heart may continue beating and the lungs may continue functioning. DiTraglia viewed Miller's injuries from strangulation as fatal and believed the strangulation rendered her unconscious, but he could not determine whether her breathing continued after the strangulation. He testified the circumstances—namely, the absence of large quantities of blood in her lungs and stomach, the absence of defensive wounds, and the absence of blood on her hands—tended to establish that Miller was not breathing vigorously when her throat was cut. The only wound that may have been defensive was a superficial cut on Miller's right index finger.[13]

During the autopsy, DiTraglia collected vaginal, rectal, and oral swabs, as well as blood from the victim's heart. He testified that the blood-alcohol level was 0.04 percent, and that the blood also contained 3,440 nanograms per million (or 3.4 micrograms per million) of cocaine and 1,320 nanograms per million (or 1.3 micrograms per million) of benzoylecgonine, a byproduct of cocaine.[14] These results were consistent with the use of cocaine near the time of death, but were not related to the cause of death.

DiTraglia testified that he examined the victim's genitalia by direct observation with a bright light, and found no signs of trauma, such as bruises, abrasions, lacerations, and tears. He explained that he did not have available a colposcope—a microscope used by clinical gynecologists to examine living rape victims—and therefore would not have been able to observe more subtle injuries that could be detected with such an instrument. He also testified that a study of 451 rape victims revealed that only 18 percent exhibited signs of physical trauma.

DiTraglia further testified that a person could inflict the wounds found on the victim's body without blood transferring to the attacker: "If Patricia Miller is unconscious, she's already been strangled, she's unconscious, she's

---

[13] DiTraglia also identified an abrasion to the upper left side of Miller's forehead that resulted from blunt-force trauma rather than from a sharp object. The abrasion measured 1.5 centimeters by 0.8 centimeters and appeared to have been inflicted at or about the time of death, because it was not red and did not show any sign of healing.

[14] DiTraglia described a study reporting that after death, the level of cocaine increases in the blood found in the heart.

lying supine on the ground, her neck is exposed, she's not moving, she's breathing shallowly, and someone would come up to her and stand over the body, or kneel over the body, and take a knife, your hand is now however long the blade is away from that. One slash, two slashes. You may or may not get blood on the knife; but in that scenario, you stand up, you walk away, you don't have any blood on you."

## f. *Blood and DNA evidence*

Criminalist Marianne Stam testified that she detected a small amount of sperm on both the vaginal and rectal swabs collected during the autopsy, but found no evidence of the presence of an ABO blood type or PGM subtype that was different from the victim's blood type and subtype. Therefore, she explained, she could not determine the source of the semen, and could not exclude defendant as the semen donor. Stam also testified that a tissue found in the victim's kitchen trash can was spotted with blood consistent with the victim's blood type. She stated that the spots of blood appeared to have been caused by the tissue coming in contact with a wound or a bloody nose, and were not similar to marks that would be left if someone had wiped his or her hands or a knife on the tissue. She also testified that four cigarette butts found in the apartment tested positive for the presence of an enzyme found in saliva, but only two exhibited an ABO blood type, and that type was consistent with the victim's type.

DNA testing was performed by criminalists Daniel Gregonis and Martin Buoncristiani. Gregonis testified that he extracted sperm cells from the vaginal swab and performed restriction fragment-length polymorphism (RFLP) testing, but was unable to determine DNA fragment lengths. He attributed the failure to the small amount of DNA and to degradation that may take place due to the unchecked growth of bacteria in a body after death. Buoncristiani testified that he conducted polymerase chain reaction (PCR) testing on samples of sperm from the vaginal and rectal swabs, by which he examined the HLADQL locus, or region, of the DNA, which varies among individuals. He testified that the testing yielded results consistent with defendant's DNA. He also testified that the particular genotype identified through the PCR testing appears in approximately 7.9 percent of African-Americans, and in approximately 1 to 8 percent of the population comprised of African-Americans, Caucasians, and Hispanics. He confirmed that if a second individual had engaged in sexual relations with the victim, and had left an equal amount of sperm or not much less sperm, the PCR testing also would have reflected a different genotype, unless the two donors had the same genotype for the particular locus.

### g. *Defendant's previous rape of Christa B.*

Christa B. testified that defendant raped her four years prior to the charged crimes. She testified that she was introduced to defendant by her boyfriend in 1987, and defendant had visited her at her apartment once before the night that he raped her. She related that shortly after midnight on September 2, 1987, approximately two weeks after his first visit, defendant rang the bell to her apartment and spoke to her through her building's security system. He identified himself, asked whether he could come in, and said he "just want[ed] to chitchat." She let him in and they spoke for approximately one hour in the living room, while they watched television, drank beer, and smoked marijuana. Christa testified that defendant asked her, "What would you do if I came on to you?" She told him she would not like it, because she was in love with her boyfriend.

Christa testified that after conversing with her for an hour or longer, defendant walked into her bedroom, looked out a large window, and asked Christa to come into the bedroom because he wanted to show her something. When she entered the bedroom, he pushed her onto her back on the bed, got on top of her, and held her hands tightly above her head. Christa testified that her knees were up to her chest. She stated that defendant told her he had a knife, and that if she did not cooperate, he would slice her throat. She stated that she initially refused to disrobe, but complied after he again threatened to slice her throat. He freed one of her hands to allow her to disrobe, and he removed his pants. Christa testified that defendant was able to hold both of her hands with one of his hands. She noted that she was five feet four inches in height and weighed 105 pounds at the time of the rape. She testified that "he's very strong," and "I feel I was over-powered, and I was very scared and intimidated that he was going to kill me." She stated that while defendant continued to hold her hands above her head, he removed his pants, forced her legs apart with his knee, and raped her, but he did not ejaculate.

Christa testified that defendant then allowed her to get up and walk to the living room, where she put on some clothing. He asked her where she was going, and she responded, "nowhere." He asked her what she would tell her boyfriend, and she said "nothing." She testified that she was shocked by what he had done, because she thought he was her friend. She was scared and crying, and asked defendant to leave. He told her that if she reported the incident to law enforcement or to her boyfriend, he would kill her, and claimed he previously had been paid $10,000 to kill someone. She continued to carry on a conversation with him as she walked to the door of the apartment, but as she turned the door handle, he blocked her exit. She testified that he then placed her in a chokehold, dragged her to the bedroom, got on top of her, and strangled her by placing his thumbs against the front of

her throat and his hands around the back. She testified that he squeezed very hard and said, "You didn't think I was going to hurt you. You didn't think I was going to kill you. Well, you're wrong." Christa stated that she struggled against him, but was overpowered and lost consciousness.

Christa testified that when she regained consciousness, she saw a different man in her living room, holding her television. When the man saw her as she attempted to rise, he dropped the television, came into the bedroom, and began to strangle her. Christa stated that as she fought back, the man lost his grip on her throat. She testified that he punched her repeatedly in the face. She then kicked the large window by the bed, breaking it and causing "a lot of noise," causing the man to flee from the apartment. Christa testified that she called her boyfriend, who brought her to his apartment, and that later that morning she contacted the police, who interviewed her at the hospital. She stated that after leaving the hospital, she and her boyfriend located defendant and identified him to police officers. Christa stated that when she identified defendant, he said, "I'm going to get you, bitch." Christa stated that she testified at the preliminary hearing, but told the prosecutor that she did not want to go through a trial. She further related that the prosecutor informed her that the state would agree to a plea agreement, with defendant pleading guilty to rape and receiving a prison term of six years, and the state dropping the attempted murder charge. Christa agreed with that resolution of the matter.

Yvonne Vigil, a detective with the Los Angeles Police Department, testified concerning her interview of Christa at Santa Monica Hospital on September 2, 1987. She stated that Christa was distraught and in pain, and had injuries to her head and neck. According to Vigil, Christa had difficulty speaking, but was responsive and did not appear to be evasive. Vigil's testimony concerning her interview of Christa demonstrated that the description of the events given by Christa at defendant's trial was substantially similar to the description Christa provided to Vigil on the day after the event. Vigil testified that Christa told her that the assailant came to her apartment at 12:30 a.m.; that she had known the assailant for four or five months; that his name was Michael and his last name could be "Thomas"; that she voluntarily had admitted him to her apartment when he came by to visit; that they sat in the living room on the couch and consumed two beers; that at approximately 3:00 a.m., he beckoned her into her bedroom, assertedly to show her something; that he pushed her onto the bed, and she landed on her back with her knees up to her chest; that when she refused to put her legs down or take off her top, he told her he had a knife in his back pocket and was going to slice her throat; that he held both of her wrists with one of his hands, and removed his pants and underwear; that he placed his knee between her knees and forced her legs open; that he engaged in intercourse for approximately three minutes, but did not ejaculate; that she walked into the living room to

get dressed; that he came out of the bedroom and told her that "he better not see the police question him about this, . . . [and] he better not see her boyfriend . . . question him about it," or he would hurt her; that he claimed he had been paid $10,000 to kill someone; that she told him to "[g]et out of here or you'll be in trouble," but then claimed she was "just kidding"; that he shut the apartment door when she attempted to leave, and pushed her back into the bedroom; that she landed on her bed, where he got on top of her, placed his hands over her neck and strangled her; that she lost consciousness, and when she regained consciousness, another person was in her living room, and that person punched her repeatedly on the right side of her head and attempted to strangle her; and when she broke a large window in her apartment, the person fled. According to the report Vigil prepared after the interview, Christa stated that she told defendant, "I thought you were my friend and now you've just raped me." According to the report, Christa stated that defendant responded, "I did not rape you. It's your word against mine. I could tell them that you were drunk, that you took your clothes off and wanted me to seduce you."

### 2. The defense case

Defendant presented three witnesses. Dr. Mona Matheus was a resident physician in the emergency room of Santa Monica Hospital who examined Christa B. after defendant raped her. Matheus testified that the record of the examination she prepared reflected that Christa had injuries to her face, temples, neck, and legs, but the record did not reflect injuries to her vaginal area.

Deborah Hill, a certified nurse examiner in cases of sexual assault, testified that the genitals are the primary site of injury from a sexual assault. She described the phases of normal human sexual response that allow the vaginal area to accommodate penile penetration without suffering trauma. She testified that when sex is nonconsensual, these phases do not occur, and the victim suffers injuries such as redness, swelling, lacerations, tearing, abrasions, and bruising. She agreed on cross-examination that inspecting a victim with the naked eye and a bright light would reveal genital trauma in only 10 to 30 percent of cases of nonconsensual sex.

Dr. Terrence McGee testified concerning the levels of cocaine and its byproduct, benzoylecgonine, in Miller's body, and the symptoms that may be caused by the ingestion of cocaine. He characterized the level of cocaine in Miller's heart as "a real high dose," even taking into account the circumstance that the concentration of cocaine in the heart increases after death. He testified that he could not estimate the amount of cocaine consumed by the victim because, he explained, the rate at which cocaine degrades is not predictable. He also stated that he could not say how

a person with that level of cocaine would behave, but that the drug is a central nervous system stimulant that may increase aggression, libido, and a tendency toward violence, and compromise the user's judgment. According to McGee, some individuals are affected significantly by small amounts of cocaine, and others develop a tolerance to cocaine through use and require more cocaine to achieve the same effects. He testified that, when consuming cocaine, a person generally will not be attentive to the time of day. He also stated that the drug may affect an individual's perception of an event, but he or she will be capable "of giving . . . a rudimentary account of what transpired." McGee concluded that "cocaine numbers don't mean much in and of themselves no matter where [in the body] you draw [the blood] from."

## B. *Penalty phase evidence*

### 1. *The prosecution case in aggravation*

The victim's daughter, Danyelle, described the several foster care homes in which she and her brother, Demetreus, resided after their mother died. She explained that the children had resided with only their mother until she died, and that it was difficult to live with strangers. She also testified that she felt sad and angry that none of her relatives could take them in. According to Danyelle, after their mother's death Demetreus became quiet, frequently cried, and felt anger and rage. Danyelle described her mother as a hard-working, loving, caring person who would do anything for her children. She testified that her mother had done well in school, and regularly helped and encouraged her children with their school work. Danyelle identified her mother, Demetreus, and herself in various photographs, and noted some of the enjoyable activities they had shared. She described a nightmare in which she was in a classroom, and her mother's body was sitting behind her, and her mother's head was on the desk in front of her, calling Danyelle's name. Danyelle stated that her mental picture of her mother as she found her in the living room will haunt her the rest of her life.

Demetreus was 12 years of age and in the seventh grade at the time of the trial. He testified that he missed his mother very much. He remembered having to reside in strangers' homes, and being fearful and sad. He testified that he loved his mother and missed how much fun she was. He particularly missed her on Christmas and on his birthday. He stated he was happy residing with Claudia Glover, who had adopted him.

Claudia Glover became the children's third foster parent in July 1993. Glover testified that when she assumed this role, the children were very upset and required therapy. According to Glover, Demetreus frequently cried and Danyelle was withdrawn. By the time Glover adopted Demetreus, Danyelle

was an adult. Glover stated that at the time of trial, Danyelle was a single mother, with a child 16 months of age, and was attending college.

Debra G. testified that she met defendant when she visited relatives in Arkansas in 1985. She testified that she became pregnant with his child, who was born in June 1986. She revealed that once during the four months she spent in Arkansas, defendant lifted her up and slammed her against a wall during an argument. Debra stated she moved back to Venice, California, and defendant moved there to be near her. According to Debra, they resumed dating, but defendant again became violent toward her. She testified that he threw her on the ground and took their baby away for three days, and that he drove a vehicle at her, causing her to run to avoid being struck. She stated that on several occasions, he forced her to have sexual relations with him, once in a vehicle. She testified that he was able to hold both of her hands with one hand and that, when he raped her in a bed or on the ground, he held her hands above her head. She stated that she resisted him, but he would not accept "no" as an answer and forced himself on her. She stated that when he smoked rock cocaine and there was nothing left to smoke, he sometimes would become angry. She recalled that each time he sexually assaulted her, he had been smoking rock cocaine. She testified she was afraid of defendant and feared for her life.

On cross-examination, defense counsel impeached Debra's claims of physical violence with contrary statements she made to a defense investigator. Counsel suggested that defendant's anger at Debra was the result of her neglect of their child, and that Debra turned against defendant when defendant's father obtained custody of their child due to Debra's cocaine addiction, homelessness, and mental health problems.

### 2. The defense case in mitigation

Defendant's mother, Betty Jo DeFrance, testified that defendant was born in 1963, in Texarkana, Arkansas, when DeFrance was 17 years of age. She stated that defendant's father was absent during much of defendant's early childhood because he served in the military, and he and DeFrance separated in 1968. She described defendant as a loving, happy child who liked to hug his mother and make her laugh. She stated that, other than a habit of rocking back and forth, defendant had no behavioral problems as a child. He was involved in 4-H, Cub Scouts, Boy Scouts, basketball, boxing, and baseball, and had a newspaper route. She testified that his school attendance became poor during his sophomore year of high school, and he left home to reside with an uncle in another town in Arkansas, because DeFrance would not tolerate his truancy. She stated that defendant's younger brother, Sheldon, was born after defendant left home, but defendant returned in 1980, when

Sheldon, then two years of age, was close to death from cancer. According to DeFrance, defendant became quiet and withdrawn after Sheldon's death. She testified that in 1982, DeFrance's brother, Don, who was three years older than defendant and had been close to defendant, drowned. She stated that defendant was devastated by Don's death.

Jean Walker, whose husband was defendant's paternal uncle, testified that she met defendant in approximately 1970, when she visited her husband's relatives in Texarkana. Walker testified that defendant's mother never was present when Walker visited, and that defendant spent a significant amount of time at his grandmother's house while Walker was in Texarkana. When defendant was 18 years of age, he moved to San Diego and resided with Walker and her husband. According to Walker, defendant was employed by a cabinetmaker, and also worked at a toy store. She stated that when he injured his back at work, he received a workers' compensation award of several thousand dollars, which he and his older cousin spent on drugs. She testified that during one conversation with defendant concerning his use of cocaine, he stated he was troubled by the deaths of his brother and his uncle. She stated that at some point, her husband ordered defendant to leave their home, due to defendant's use of cocaine. She also testified that defendant wanted custody of his daughter, and that he bought his daughter clothes. Walker described defendant as loving and helpful, and testified he never was a bitter or violent person. The Michael Lewis she knew was a "[v]ery loving, honest child."

## II.

## DISCUSSION

A. *Guilt phase*

1. *Admission of postmortem photographs of the victim*

Defendant contends the trial court abused its discretion by admitting into evidence multiple photographs of the victim taken at the crime scene and at the autopsy. He claims the photographs were cumulative, irrelevant, and highly prejudicial, and their admission violated his right to a reliable guilt phase verdict, a fair trial, and due process of law under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and article I, section 7 of the California Constitution.

Defendant moved in limine to exclude the People's photographic evidence on the ground that the probative value of the photographs was outweighed by their prejudicial effect. (Evid. Code, § 352.) After reviewing this evidence, the trial court concluded it was relevant and was neither unduly prejudicial nor cumulative.

"This court is often asked to rule on the propriety of the admission of allegedly gruesome photographs. [Citations.] At base, the applicable rule is simply one of relevance, and the trial court has broad discretion in determining such relevance. [Citation.] ' "[M]urder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant" ' [citation], and we rely on our trial courts to ensure that relevant, otherwise admissible evidence is not more prejudicial than probative (Evid. Code, § 352). A trial court's decision to admit photographs under Evidence Code section 352 will be upheld on appeal unless the prejudicial effect of such photographs clearly outweighs their probative value. [Citation.] Finally, prosecutors, it must be remembered, are not obliged to prove their case with evidence solely from live witnesses; the jury is entitled to see details of the victims' bodies to determine if the evidence supports the prosecution's theory of the case. [Citations.]" (*People v. Gurule* (2002) 28 Cal.4th 557, 624 [123 Cal.Rptr.2d 345, 51 P.3d 224].)

"To determine whether there was an abuse of discretion, we address two factors: (1) whether the photographs were relevant, and (2) whether the trial court abused its discretion in finding that the probative value of each photograph outweighed its prejudicial effect." (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 211–212 [79 Cal.Rptr.3d 125, 186 P.3d 496].) Having examined all of the photographs, we find that each is relevant, and that "they are not of such a nature as to overcome the jury's rationality." (*Id.* at p. 212.)

Exhibit 1, a photograph depicting the victim as she was found in her apartment, provides evidence demonstrating that the victim was sexually assaulted, and that the manner of the assault was similar to defendant's assault upon Christa B. This photograph also corroborates the testimony of Detective Bender and criminalist Paul Sham concerning the location of blood on and around the victim's body.

Exhibit 2 includes nine photographs depicting the interior of the victim's apartment.[15] These photographs corroborate Bender's testimony that there was no sign of a struggle and no blood splatter, and constitute evidence tending to establish that the attacker may have suffered no visible injuries and left the scene with no blood on his clothing. Each photograph depicts a different aspect of the apartment, and therefore none is cumulative. The circumstance that the victim's body, covered by a blue blanket, appears in

---

[15] The nine photographs were displayed on a poster board and were labeled 2A through 2I. Two additional photographs were part of exhibit 2, but were not displayed on the poster board: A photograph of the victim's body, rolled onto its left side and thereby exposing the pattern of blood beneath the body, is labeled 2J. A photograph of the walkway between the victim's apartment building and the apartment building to the west is labeled 2K. Defendant addresses only the nine photographs on the poster board.

three of the photographs (2B, 2D, and 2H) does not render these photographs cumulative or unduly prejudicial.

Exhibit 5 includes seven photographs of the victim's body on the medical examiner's table. Exhibits 5A and 5B are full-length photographs of the victim, taken from either side. They reflect the victim's thin build and the absence of injuries, and are relevant to establish that defendant could have overpowered the victim, and did overpower her, with little struggle. Exhibit 5C is a photograph of the victim, from the chest up, taken before her bloody top was removed and her body was cleaned. It reflects where blood flowed and also shows the abrasion identified by Dr. DiTraglia on the upper left side of her forehead. Exhibits 5D and 5E are closeup photographs of the victim's neck, taken after the wound was cleaned. The view in 5D is the front of the victim's neck, and in 5E the right side of the victim's neck. Together, these photographs document the breadth and depth of the wound. They reflect the viciousness and strength of the assault, which is relevant to prove that defendant acted with malice and sought to ensure the victim was dead. They also raise doubt with respect to defendant's claim that an alleged intoxicated third party who barely could stand or sit up in the victim's apartment could have inflicted such a wound. (See *People v. Wright* (1990) 52 Cal.3d 367, 434 [276 Cal.Rptr. 731, 802 P.2d 221] [photographs "were relevant to show the extent of the victim's injuries and the amount of force used in the commission of the murder"].) Finally, exhibits 5F and 5G are photographs of the victim's right lower eyelid and right upper eyelid, which have been pulled down and up, respectively, to expose petechial hemorrhages. These photographs demonstrate that the victim was strangled.[16]

▮ Each of these photographs was probative with respect to significant issues, and none was cumulative. In addition, in light of Dr. DiTraglia's detailed description of the damage inflicted upon the victim's neck, "the photographs were not so gruesome as to have impermissibly swayed the jury." (*People v. Smithey* (1999) 20 Cal.4th 936, 974 [86 Cal.Rptr.2d 243, 978 P.2d 1171] ["In light of the testimony . . . detailing all the circumstances of the crime scene and the condition of the victim, the photographs were not so gruesome as to have impermissibly swayed the jury."].) We find no abuse

---

[16] The seven photographs labeled 5A through 5G were displayed on a poster board. Exhibit 5 also included a third closeup photograph of the laceration of the victim's neck. This photograph, labeled 5H, was not displayed on the poster board, and is not addressed by defendant on appeal. Dr. DiTraglia explained that, after examining the wound as he found it, he "reconstructed it, that is, pulled the edges back to their normal anatomic positions." As reconstructed, the two cuts described by Dr. DiTraglia become apparent, as reflected in exhibit 5H.

Exhibit 5 also included a photograph of the victim's hand, showing a small cut on one of her fingers (exhibit 5L), and five medical diagrams and drawings used by Dr. DiTraglia during his testimony (exhibits 5I, 5J, 5K, 5M & 5N).

of discretion in the trial court's ruling. With respect to defendant's claims of constitutional error, we note that "[t]he 'routine application of state evidentiary law does not implicate [a] defendant's constitutional rights.' [Citation.]" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1010 [81 Cal.Rptr.3d 299, 189 P.3d 300] (*Hovarter*).)

### 2. *Admission of evidence of defendant's prior rape*

Defendant claims the admission of evidence concerning his rape of Christa B. was unduly prejudicial under the standards set forth in *People v. Falsetta* (1999) 21 Cal.4th 903 [89 Cal.Rptr.2d 847, 986 P.2d 182] (*Falsetta*), and violated his rights to due process of law and a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

The People moved in limine to admit Christa B.'s testimony concerning defendant's rape of Christa, and documentary evidence concerning his conviction of that offense. This evidence was offered to prove motive, intent, a common design, and lack of consent by the victim (Evid. Code, § 1101, subd. (b)) and to demonstrate defendant's propensity to commit sexual assaults (Evid. Code, § 1108), thereby establishing that he raped and murdered the victim. Defendant moved in limine to exclude evidence of the prior offense, arguing that the earlier incident and the charged conduct lacked sufficient similarity to establish identity or a common plan or scheme (Evid. Code, § 1101), and that the probative value of this evidence was substantially outweighed by its prejudicial effect (Evid. Code, § 352). Defendant also moved for a new trial, based in part upon the assertedly erroneous admission of evidence concerning his rape of Christa B. The trial court ruled the evidence was admissible under both sections 1101 and 1108 of the Evidence Code, and subsequently denied the motion for a new trial.[17]

---

[17] At the hearing on the motions in limine, the trial court's ruling concerning the purposes for which the evidence was admitted was somewhat ambiguous, but the court directed the parties to prepare a limiting instruction. The parties agreed to "Special Instruction No. 1," which stated that the evidence could be considered if it tended to show:

"1. A characteristic method, plan or scheme in the commission of criminal acts similar to the method, plan or scheme used in the commission of the offense in this case which would further tend to show the existence of the intent which is the necessary element of the crime charged;

"2. A motive for the commission of the crime charged; and

"3. That the defendant did not reasonably and actually believe that the person with whom he engaged or attempted to engage in a sexual act consented to his conduct.

"Furthermore, if you find that the defendant committed a prior sexual offense, you may, but are not required to, infer that the defendant had a disposition to commit the same or similar type of sexual offenses. . . ." (See *post*, fn. 29.)

Defendant contends the trial court erred in two respects. First, he asserts the court failed to exercise its discretion, because it assertedly did not consider the factors relevant to an evaluation of whether the prejudicial effect of evidence of a prior sexual offense outweighs the probative value of such evidence. Second, he claims the trial court abused its discretion by concluding that the probative value of the evidence outweighed its prejudicial effect.

■ With respect to his first contention, defendant faults the trial court for focusing upon the similarity of the prior and the charged offenses—a "relatively irrelevant factor," in his view—and for failing to discuss other factors identified in *Falsetta, supra,* 21 Cal.4th at page 917.[18] The similarity of the offenses, however, was central to the court's evaluation of whether the evidence tended to prove motive, intent, a common design, defendant's identity as the perpetrator, or the victim's lack of consent, under Evidence Code section 1101. (*People v. Kelly* (2008) 42 Cal.4th 763, 782–784 [68 Cal.Rptr.3d 531, 171 P.3d 548] (*Kelly II*); *People v. Balcom* (1994) 7 Cal.4th 414, 423–424 [27 Cal.Rptr.2d 666, 867 P.2d 777] (*Balcom*); *People v. Ewoldt* (1994) 7 Cal.4th 380, 393–406 [27 Cal.Rptr.2d 646, 867 P.2d 757] (*Ewoldt*).) In addition, the degree of similarity is relevant to the evaluation of whether the probative value of the evidence outweighs its prejudicial effect under Evidence Code section 1108. (*Falsetta, supra,* 21 Cal.4th at p. 917.) Finally, defendant's memorandum of points and authorities in opposition to the admission of the evidence focused principally upon the asserted absence of sufficient similarity. Thus, it is no surprise that the trial court's comments were directed to that issue. With respect to relevant factors *not* mentioned by the trial court, we note that "a court need not expressly weigh prejudice against probative value or even expressly state that it has done so, if the record as a whole shows the court was aware of and performed its balancing function under Evidence Code section 352." (*People v. Taylor* (2001) 26 Cal.4th 1155, 1169 [113 Cal.Rptr.2d 827, 34 P.3d 937].) The record reflects that the court performed its duty to balance the probative value of this evidence against its prejudicial effect.[19]

---

[18] In the course of analyzing Evidence Code section 1108, *Falsetta* explained: "Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense. [Citations.]" (*Falsetta, supra,* 21 Cal.4th at p. 917.)

[19] At the hearing on the motions, the trial court stated it had reviewed both parties' points and authorities. After the prosecutor addressed various factors relevant to the issue of whether the evidence should be admitted, he offered to submit the matter unless the court indicated any additional area it wished addressed. The court stated, "I think it's been covered adequately in

Defendant's second contention—that the trial court abused its discretion in concluding the probative value outweighed the prejudicial effect—also fails. "Under the abuse of discretion standard, 'a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" (*Hovarter, supra,* 44 Cal.4th at p. 1004; see also *People v. Rogers* (2006) 39 Cal.4th 826, 862 [48 Cal.Rptr.3d 1, 141 P.3d 135] (*Rogers*) [abuse of discretion standard applies to admission of evidence under Evid. Code, § 1101]; *People v. Wesson* (2006) 138 Cal.App.4th 959, 969 [41 Cal.Rptr.3d 883] [abuse of discretion standard applies to admission of evidence under Evid. Code, § 1108].)

■ Defendant's challenge is narrow. He urges that the trial court abused its discretion in admitting the evidence under Evidence Code *section 1108,* because its probative value assertedly was outweighed by its prejudicial effect.[20] In a case in which a defendant is accused of a sexual offense, Evidence Code section 1108 authorizes the admission of evidence of a prior sexual offense to establish the defendant's propensity to commit a sexual offense, subject to exclusion under Evidence Code section 352. (Evid. Code, § 1108, subd. (a); *Falsetta, supra,* 21 Cal.4th at p. 911.) We find nothing arbitrary, capricious, or patently absurd in the trial court's ruling that evidence of defendant's prior offense was admissible to prove his propensity to commit the charged sexual offense.

---

your statements and also in your Points and Authorities. You've answered some of the notes I had written down here." Defense counsel argued that the evidence was more prejudicial than probative. The trial court responded to the defense's particular contentions, explained that it found no undue prejudice, and stated that "[t]he prejudicial effect here is that this is very probative evidence. . . . [¶] So under all of the various factors that this Court needs to consider, admissibility is favored." The trial court also reviewed the similarities between the two offenses, and concluded the evidence was "more probative than prejudicial, subject to a limiting instruction."

[20] Although stating that he does not concede the evidence was admissible under Evidence Code section 1101, defendant "declines to specifically argue its inadmissibility" under that statute. He explains his decision to address only Evidence Code section 1108, as follows: "Evidence Code section 1108 is far less restrictive than [Evidence Code section] 1101, so if evidence is more prejudicial than probative under section 1108, it would likewise be inadmissible under 1101. Therefore, [Evidence Code section] 1101 does not provide an alternative independent basis for admissibility here." Defendant states that he "is prepared to respond to any suggestion to the contrary in the Reply Brief if so presented in Respondent's Brief." He directs the court to the pages of the clerk's transcript containing his arguments in support of his motion in limine and his motion for a new trial, in which he argued the evidence was not admissible under Evidence Code section 1101. The respondent's brief includes a section addressing the relevance of this evidence under Evidence Code section 1101, but defendant's reply brief does not respond. Because defendant does not address the question whether the probative value of the evidence under Evidence Code section 1101—to prove a common scheme, a motive, or that defendant did not believe the sexual act was consensual— was outweighed by its prejudicial effect, defendant has forfeited any contention that the trial court abused its discretion in admitting this evidence under Evidence Code section 1101.

The probative value of the evidence was strong. First, the two sexual assaults shared many similarities. Defendant was acquainted with both victims before the assaults, and therefore may have chosen them because they would be more inclined to grant him access to their homes, where the assaults occurred. Both attacks occurred late in the evening after defendant socialized and ingested drugs with the victims, suggesting they were induced to let down their guard. Both victims were small in stature and therefore less able to resist a physical assault. The hands of both victims were pinned above their heads. Both victims were strangled. Defendant threatened to slice Christa B.'s throat, and Miller's throat was cut. Second, the prior offense occurred only four years earlier, and defendant had been incarcerated for much of the intervening time. Finally, the independent sources of the evidence, particularly the police detective's testimony that Christa contemporaneously reported the same details of the prior offense that were set forth in her testimony at defendant's trial, increased the probative value of the evidence. (See *Falsetta, supra*, 21 Cal.4th at p. 917.)

The risk of *undue* prejudice was minimal. Because defendant was convicted of the prior rape and sentenced to prison, "the jury would not be tempted to convict [him] simply to punish him for the other offenses, and . . . the jury's attention would not be diverted by having to make a separate determination whether defendant committed the other offenses."[21] (*Falsetta, supra*, 21 Cal.4th at p. 917.) There also was little likelihood the jury would be distracted from its principal inquiry—whether defendant raped and murdered Miller. Nor do we find it likely the jury would be confused by the different standards of proof pertaining to the issue of whether defendant committed the prior acts (preponderance of the evidence) and whether he committed the current offenses (beyond a reasonable doubt); all juries in criminal proceedings in which evidence of uncharged conduct is admitted under Evidence Code section 1108 are called upon to apply these two different standards. Contrary to defendant's contention, we perceive no reason why the required analysis would have been particularly confusing in this case because of the circumstance that the victim of the prior rape testified, whereas the charged rape was proved through circumstantial evidence. Although evidence of the prior offense would elicit a negative emotional response from the jurors in this case, it was less inflammatory than the charge that defendant raped, strangled, and cut the throat of Patricia Miller while her children slept upstairs. (See *People v. Demetrulias* (2006) 39 Cal.4th 1, 19 [45 Cal.Rptr.3d

---

[21] Defendant contends the trial court erroneously refused to consider that he may have been innocent of the earlier charges, and that he accepted a three-year prison sentence, prior to the enactment of Evidence Code section 1108 (but well after the enactment of Evid. Code, § 1101), in order to avoid a potential sentence of 27 years to life. The trial court had no authority, however, to reject evidence of a valid prior conviction on the ground that defendant's guilty plea to that matter was entered in order to avoid a lengthy sentence or that the plea was otherwise ill advised.

407, 137 P.3d 229] [the court noted, in evaluating any undue prejudice from evidence admitted under Evid. Code, § 1101, that the prior offense involved a serious assault, but the charged offense was murder].) Finally, in any case in which evidence of other acts committed by a defendant is admitted, the defendant will face the decision whether to testify concerning the prior acts or to remain silent. Contrary to defendant's contention, this circumstance does not render such evidence unduly prejudicial. A defendant is faced with this choice whenever evidence is admitted that he or she personally could rebut.

In the course of addressing the asserted undue prejudice, defendant contends it was improper to admit evidence establishing that he choked Christa B., because choking is not a "sexual offense" within the meaning of Evidence Code section 1108. It is irrelevant whether all of the evidence concerning defendant's assault upon Christa B. was admissible under Evidence Code section 1108, because defendant fails to establish that the trial court abused its discretion by admitting the evidence under Evidence Code section 1101. Similarly, he asserts it was improper to admit evidence of a prior sexual offense to prove that he committed the nonsexual offense of murder. Again, defendant fails to establish that the evidence of the sexual assault was not admissible under Evidence Code section 1101 to prove the commission of a murder. Moreover, this evidence was relevant to the offense of felony murder, with rape as the underlying offense. (*People v. Story* (2009) 45 Cal.4th 1282, 1285 [91 Cal.Rptr.3d 709, 204 P.3d 306] [a murder committed during the course of a rape is a "sexual offense" within the meaning of Evid. Code, § 1108].) Finally, contrary to defendant's contention, it is irrelevant that the elements of the offense of rape are distinct from the elements of murder. The issue under Evidence Code section 1101 was whether the evidence tended to prove that defendant committed the crimes with which he was charged; it was not necessary that the evidence establish identical criminal offenses.

In sum, we find no abuse of discretion in the trial court's conclusion that the probative value of this evidence outweighed its prejudicial effect in establishing defendant's propensity to commit the charged sexual offense. (Evid. Code, § 1108.) Because defendant has declined to engage in an analysis focused on whether the evidence of his prior crimes was admissible under Evidence Code section 1101 to prove a common scheme, a motive, or that defendant did not believe the sexual act was consensual, we have no occasion to address whether the evidence of his prior crimes established that they were sufficiently similar to the charged offenses to authorize its admission for these purposes, or whether the prejudicial effect of this evidence outweighed each purpose for which it was offered. (See *Ewoldt, supra,* 7 Cal.4th at pp. 402–407.) We decline defendant's invitation to reconsider our decision in *Falsetta, supra,* 21 Cal.4th 903, and to hold that the admission of evidence under Evidence Code

section 1108 to establish a defendant's propensity to commit a sexual offense violates his or her due process rights. Not only has defendant failed to convince us that section 352 is not an adequate safeguard against the admission of unduly prejudicial evidence, but he also has not established that the evidence admitted in the present case was not independently admissible under section 1101. (*Balcom, supra,* 7 Cal.4th at pp. 423–424; *Ewoldt, supra,* 7 Cal.4th at pp. 393–406.) Finally, with respect to defendant's claims of constitutional error, we note that "[t]he 'routine application of state evidentiary law does not implicate [a] defendant's constitutional rights.' [Citation.]" (*Hovarter, supra,* 44 Cal.4th 983, 1010.)

### 3. *Sufficiency of the evidence to prove rape and murder*

█ Defendant contends the trial court erred in denying his motion for a new trial or to modify the verdict. He claims the evidence presented at trial was insufficient to support his conviction, in violation of his right to due process of law under the Fourteenth Amendment to the United States Constitution and article I, section 15 of the California Constitution. (See *In re Winship* (1970) 397 U.S. 358, 364 [25 L.Ed.2d 368, 90 S.Ct. 1068] ["the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"].)[22]

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27 [82 Cal.Rptr.3d 323, 190 P.3d 664].) "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of

---

[22] In the trial court, defendant's motion for a new trial or to modify the verdict was based principally upon three contentions—(1) evidence of other crimes should have been excluded, (2) jury instructions concerning evidence of other crimes were confusing and contradictory, and (3) the evidence was insufficient to sustain the conviction. His motion also asserted summarily that "the evidence in aggravation did not substantially outweigh evidence in mitigation," and requested modification of the verdict, "given the lingering doubt and mitigation in this case."

On appeal, defendant challenges the denial of his motion for a new trial or to modify the verdict based upon only the asserted insufficiency of the evidence presented at trial. He adds that, "to the extent this argument shows that had the prior rape evidence been excluded, the rest of the evidence would have been insufficient as a matter of law, [defendant] submits this as proof of the prejudicial impact the prior rape evidence had on [defendant's] case." As explained above, the evidence of the prior rape was properly admitted. Therefore, our analysis of his challenge to the denial of his motion for a new trial or to modify the verdict addresses only the sufficiency of the evidence.

fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 318–319 [61 L.Ed.2d 560, 99 S.Ct. 2781]; see *People v. Staten* (2000) 24 Cal.4th 434, 460 [101 Cal.Rptr.2d 213, 11 P.3d 968] ["An identical standard applies under the California Constitution."]; *People v. Cain* (1995) 10 Cal.4th 1, 39 [40 Cal.Rptr.2d 481, 892 P.2d 1224] [the same standard applies to the sufficiency of the evidence to sustain a special circumstance finding].)[23] "[I]t is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt." (*People v. Bean* (1988) 46 Cal.3d 919, 933 [251 Cal.Rptr. 467, 760 P.2d 996].) "In a case, such as the present one, based upon circumstantial evidence, we must decide whether the circumstances reasonably justify the findings of the trier of fact, but our opinion that the circumstances also might reasonably be reconciled with a contrary finding would not warrant reversal of the judgment. [Citation.]" (*People v. Proctor* (1992) 4 Cal.4th 499, 528–529 [15 Cal.Rptr.2d 340, 842 P.2d 1100].)

■ We begin our review of the sufficiency of the evidence with the evidence establishing that Miller was raped. "Forcible rape is an act of sexual intercourse accomplished with a person not the spouse of the perpetrator against the person's will by means of force or violence." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1130 [40 Cal.Rptr.3d 118, 129 P.3d 321]; see § 261, subd. (a)(2).) When Miller was found, she was lying on the floor, her shirt was pushed up, her pants were pulled off, except at the bottom where they apparently caught on her feet, and her hands lay above her head, apparently having been pinned down to prevent her from resisting her attacker. The evidence also established that she had been strangled before her throat was cut, indicating that force was used to disable her sometime before she was killed. Finally, sperm was detected in the vaginal and rectal swabs. From these circumstances, a juror reasonably could conclude that Miller was forced to have sexual intercourse against her will.[24]

---

[23] Defendant, claiming a requirement of heightened reliability in capital cases, asserts that evidence of guilt must be stronger in a capital case than in a noncapital case. The cases he cites do not support his assertion. (See *Beck v. Alabama* (1980) 447 U.S. 625, 637–638 [65 L.Ed.2d 392, 100 S.Ct. 2382] [procedural rule barring instruction on a lesser included offense diminished the reliability of the guilt determination with respect to the capital offense and thereby diminished the reliability of the capital sentencing determination]; *People v. Marshall* (1997) 15 Cal.4th 1, 34–35 [61 Cal.Rptr.2d 84, 931 P.2d 262] [the court applied the substantial evidence standard established in *Jackson v. Virginia, supra,* 443 U.S. at pp. 318–319].)

[24] Defendant cites *People v. Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942] (*Anderson*), *People v. Granados* (1957) 49 Cal.2d 490 [319 P.2d 346], and *People v. Craig* (1957) 49 Cal.2d 313 [316 P.2d 947], in support of his contention that the evidence is insufficient to establish that the victim was raped. "The cited decisions, as a group, may be read to establish 'that the victim's lack of clothing . . . is insufficient to establish specific sexual intent.' [Citation.]" (*People v. Holloway* (2004) 33 Cal.4th 96, 139 [14 Cal.Rptr.3d 212, 91 P.3d 164]; see also *People v. Johnson* (1993) 6 Cal.4th 1, 39 [23 Cal.Rptr.2d 593, 859 P.2d 673] ["the only evidence of his rape or attempted rape of [the victim] was her partly unclothed

The evidence also established that defendant was the person who raped her. During the early evening, defendant was "putting the moves on everything that moved," and making comments such as, "I am going to fuck me something tonight, before I go." Defendant flirted with the victim at approximately 8:00 p.m., and then commented that he "wouldn't mind getting some of that." Defendant admitted engaging in sexual intercourse with Miller, and no sperm inconsistent with defendant's was detected in the swabs. The absence of any indication of forced entry to Miller's apartment, the placement of Miller's arms and hands, the injuries sustained from strangulation, and the cutting of her throat—an act with which defendant had threatened Christa B.—demonstrated that Miller was attacked in a manner similar to defendant's attack upon Christa B. The circumstance that defendant was the last person seen with Miller and was unable to provide a credible explanation of his whereabouts during the four hours after he claimed he saw her for the last time, also supported the inference that he raped Miller.[25] (See *Hovarter, supra*, 44 Cal.4th at p. 1016 [in addition to a witness's statement that the defendant said he raped the victim, the court noted that he could not be excluded as the donor of the semen, had the opportunity to commit the crime, and had committed similar crimes a few months earlier].) Further evidence that defendant was the perpetrator included his subsequent statements, which were contradictory and also inconsistent with the accounts of others.[26] In addition, he knew how Miller had been killed, and he denied raping her, before being informed by the police that she had been raped and before being accused of raping her. (See *People v. Maury* (2003) 30 Cal.4th 342, 398–399 [133 Cal.Rptr.2d 561, 68 P.3d 1] (*Maury*) [the defendant's knowledge of details of the crimes, his inconsistent statements, and his statements conflicting with the

---

body"], overruled on another ground in *Rogers, supra,* 39 Cal.4th at p. 879.) As in *Holloway,* "the finding in the present case rests on substantially more than the [victim's] nudity." (*Holloway,* at p. 139.)

[25] Although defendant claimed he last had seen the victim at approximately 10:30 p.m., he was seen walking with her at approximately 11:00 p.m. Between 11:00 p.m. and midnight, after contacting Turner about obtaining cocaine, he left the walkway by the victim's apartment, walked down the alley, and then walked back and turned into the walkway by the victim's apartment. He next was seen exiting from the victim's walkway at approximately 2:00 a.m., anxious for a taxicab. Defendant repeatedly changed his description of his activities during the evening, and never was able to explain his whereabouts between 10:30 p.m. and 2:00 a.m.

[26] For example, defendant's assertion that he had been at Mitchell's home from 10:30 p.m. until 2:00 a.m. conflicted with the testimony of Mitchell and Turner. His description of his visit to Miller's apartment conflicted with Danyelle's testimony. In addition, he changed his description of events and contradicted himself in response to evidence that Bender claimed to possess, and when he eventually admitted being in the apartment and having had sex with the victim, he identified a time and described details that were inconsistent with the testimony of others. Similarly, he initially denied that anyone else had been at the apartment, and then described a drunken man who entered the victim's apartment, but the person as he described him would have been too incapacitated to commit the crimes.

testimony of impartial witnesses supported the guilty verdict].) Thus, substantial evidence supports the jury's finding, beyond a reasonable doubt, that defendant raped Miller.

Finally, the evidence established that defendant murdered Miller in the commission of the rape. Based upon the undisturbed state of the blood under Miller's body, it appears she was murdered in the same condition and position as she was raped—on the floor, with her clothes torn off and her hands pinned above her head. In addition, in light of the similarities between defendant's conduct and threats toward Christa B. and his conduct toward Miller, the jury could conclude that defendant strangled Miller and cut her throat, and that his motive was to avoid detection. Finally, the evidence summarized above, which supports the conclusion that he was the perpetrator of the rape, also supports the conclusion that he murdered Miller: he was the last person seen with her and was unable to provide a credible explanation of his whereabouts, his statements were contradictory and inconsistent with the testimony of others, and he knew how she had been killed before being informed of the facts. Therefore, substantial evidence supports defendant's conviction, beyond a reasonable doubt, of first degree murder, based upon his commission of a homicide perpetrated in the course of a rape (§ 189), and substantial evidence also supports the special circumstance finding, beyond a reasonable doubt, that the murder was committed while defendant was engaged in the commission of, or attempted commission of, a rape (§ 190.2, subd. (a)(17)(C)).

Although unnecessary, in light of the establishment of a felony murder, we note that the evidence also supported a finding that the murder was willful, deliberate, and premeditated.[27] (§ 189.) In *Anderson, supra*, 70 Cal.2d at page 27, this court "identified three categories of evidence pertinent to the determination of premeditation and deliberation: (1) planning activity, (2) motive, and (3) manner of killing." (*People v. Perez* (1992) 2 Cal.4th 1117, 1125 [9 Cal.Rptr.2d 577, 831 P.2d 1159].) From the evidence presented, the jury could have concluded that defendant decided early in the evening to obtain sex from someone in the neighborhood, by coercion if necessary, and that he chose

---

[27] The jury was instructed that " 'willful' . . . means intentional," and that " 'deliberate' means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. The word 'premeditated' means considered beforehand." The jury was further instructed: "If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree." The court further explained that the time necessary to deliberate and premeditate will vary. "A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it includes an intent to kill, is not deliberation and premeditation as will fix an unlawful killing as murder of the first degree."

Miller as his target. Also, as noted above, the jury could have concluded that his motive in killing Miller was to avoid detection. The manner in which she was killed supported a finding of deliberation and premeditation, because Miller had been strangled to the point of unconsciousness and was not breathing vigorously *before* her throat was cut, and the wound to her throat required either two independent cuts or a single cut in which the knife was raised and pivoted midway through the cutting action. Moreover, even if the initial strangulation was spontaneous, the additional act of slashing her throat "is indicative of a reasoned decision to kill." (*Id.* at p. 1129.) Thus, a rational trier of fact could have been persuaded beyond a reasonable doubt that the killing was willful, deliberate, and premeditated. (See *id.* at p. 1127 [all that is required is that "*any* rational trier of fact could have been persuaded beyond a reasonable doubt that the defendant premeditated the murder"].)

Contrary to defendant's suggestion, the absence of forensic evidence such as defendant's fingerprints in the victim's apartment, trauma to the victim's genital area, injuries to defendant, blood splatter on defendant, or discovery of the murder weapon, does not negate the' sufficiency of the evidence to prove that defendant raped and murdered Miller. Moreover, the absence of the particular forensic evidence highlighted by defendant was not surprising or suspicious under the circumstances of the present case. Defendant admitted being in the victim's apartment and having sex with her; either he did not touch surfaces that would reflect his prints, or the fingerprints were wiped off. Even defendant's expert agreed that examination of a rape victim with the naked eye and a bright light would reveal genital trauma in only 10 to 30 percent of cases of nonconsensual sex. Because defendant was acquainted with the victim, was allowed into her apartment by her, shared cocaine with her, and was larger than she, it is reasonable to conclude he could subdue her without suffering visible injuries himself. In addition, Dr. DiTraglia's testimony established that the victim would have lost consciousness from strangulation within six to 15 seconds, and that a person could inflict the wounds without blood being transferred to the attacker. Nor is it surprising that defendant did not conceal his sexual intentions and allowed himself to be seen in the victim's company; a juror reasonably could conclude that defendant was functioning under the influence of marijuana and cocaine, and lacked the discipline or awareness necessary to conceal his intentions and actions, or the judgment to abort his plan when he realized the victim's children were home. In any event, defendant's failure to conceal all evidence of the crime does not compel the conclusion that he did not commit the

crime. Similarly, defendant's friendly behavior toward the victim—conversing with her in the alley, helping her with her laundry, and smoking cocaine with her—did not render speculative the evidence of his motive. Defendant also was very friendly to Christa B. before he raped and strangled her. Finally, defendant's alternative version of his activities that evening does not render insufficient the evidence supporting the verdict.

■ In summary, a reasonable juror could have found beyond a reasonable doubt that Miller was raped, that defendant was the person who raped her, that defendant also was the person who killed her, that he killed her during the commission of the rape or during his immediate flight after committing the rape—and that the homicide was willful, deliberate, and premeditated. Therefore, the evidence presented at trial was sufficient to support defendant's conviction of first degree murder and the finding of the special circumstance that the murder was committed during the commission of (or flight from) a rape.

4. *Jury instructions related to defendant's prior rape of Christa B.*

Defendant asserts that the trial court's instructions permitted the jury to find by a preponderance of the evidence that he committed the prior offenses against Christa B., and to infer from such a finding that he committed the charged offenses. Thus, he claims, the instructions violated his right to a jury verdict based upon a finding of guilt beyond a reasonable doubt, thereby violating his right to due process of law, a fair trial, and an impartial jury, in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and parallel provisions of the California Constitution.[28]

After Christa B. testified, and again at the conclusion of the guilt phase, the court gave an instruction, designated "Special Instruction No. 1," to guide the jury in its consideration of Christa's testimony. The instruction, a modified version of CALJIC Nos. 2.50 and 2.50.01, was drafted by the prosecutor and approved by defense counsel. It explained the purposes for which the evidence concerning the uncharged offenses could be considered, but did not

---

[28] The People assert defendant forfeited this claim because he agreed to the jury instruction about which he now complains. Because his claim of error would affect defendant's substantial rights, we address it nonetheless. (§§ 1259, 1469.)

address the burden of proof.[29] Immediately after giving Special Instruction No. 1 at the conclusion of the guilt phase, the court read CALJIC No. 2.50.1: "Within the meaning of the preceding instruction, the prosecution has the burden of proving by a preponderance of the evidence that a defendant committed a crime or sexual offense other than that for which he is charged. [¶] You must not consider this evidence for any purpose unless you find by a preponderance of the evidence that a defendant committed the other crime or sexual offense." The trial court also instructed the jury that "[a] defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places upon the People the burden of proving him guilty beyond a reasonable doubt." (CALJIC No. 2.90.) In addition, the court's instruction concerning the sufficiency of

---

[29] Special Instruction No. 1 stated:

"Evidence has been introduced for the purpose of showing that the defendant committed a crime other than that for which he is on trial.

"This evidence, if believed, may be considered by you only for the limited purpose described in this instruction. This evidence may be considered for the limited purpose of determining if it tends to show:

"1. A characteristic method, plan or scheme in the commission of criminal acts similar to the method, plan or scheme used in the commission of the offense in this case which would further tend to show the existence of the intent which is the necessary element of the crime charged;

"2. A motive for the commission of the crime charged; and

"3. That the defendant did not reasonably and actually believe that the person with whom he engaged or attempted to engage in a sexual act consented to his conduct.

"Furthermore, if you find that the defendant committed a prior sexual offense, you may, but are not required to, infer that the defendant had a disposition to commit the same or similar type of sexual offenses. If you find that the defendant had this disposition, you may, but are not required to, infer that he was likely to commit and did commit the crime of which he is accused.

"For the limited purpose for which you may consider this evidence, you must weigh it in the same manner as you do all other evidence in the case."

The instruction then defined "sexual offense" as "[a]ny conduct made criminal by Penal Code section 261, subdivision (2)," and continued:

"In weighing evidence of a prior offense, you must make several decisions. You must decide whether a prior offense has been proved. If you determine that the prior offense has not been proved, you must disregard that evidence. If you decide that a character trait of the defendant has been proved, you must decide whether the proved character trait is relevant to whether he committed the charged offense. If you find the proved character trait is not relevant to whether the defendant committed the charged offense, you must disregard the evidence of character. If you find that a character trait of the defendant has been proved and the proved character trait is relevant to whether he committed the charged offense, then you may consider this evidence together with other evidence to decide whether he committed the charged offense. You may not convict him merely because you believe he committed another offense or because you believe he has a character trait that tends to predispose him to committing the charged offense. The question before you is whether the defendant is guilty of the crime charged in this case, not whether he is guilty of any other offense. For the limited purposes for which you may consider such evidence you must weigh it as I have described in this instruction. You are not permitted to consider such evidence for any other purposes."

circumstantial evidence explained that "each fact which is essential . . . to establish the defendant's guilt must be proved beyond a reasonable doubt" (CALJIC No. 2.01),[30] and its instruction concerning a defendant's decision not to testify referred to the prosecution's burden to prove beyond a reasonable doubt every essential element of the charges (CALJIC No. 2.61).[31]

The portion of Special Instruction No. 1 about which defendant complains states that "if you find that the defendant committed a prior sexual offense, you may . . . infer that the defendant had a disposition to commit the same or similar type of sexual offenses. If you find that the defendant had this disposition, you may . . . infer that he . . . did commit the crime of which he is accused." Defendant contends that this instruction, together with the instruction that the prosecution had the burden to prove the uncharged offenses by a preponderance of the evidence, informed the jury that it could find defendant guilty of the charged crimes if it found by a preponderance of the evidence that he committed the uncharged offenses, in violation of his right to a jury verdict based upon evidence establishing guilt beyond a reasonable doubt.

Special Instruction No. 1 also informed the jurors, however, that "[y]ou may not convict [defendant] merely because you believe· he committed another offense or because you believe he has a character trait that tends to predispose him to committing the charged offense." (See ante, fn. 29.) This clarification anticipated a 1999 revision to CALJIC No. 2.50.01, which added the following paragraph: "However, if you find [by a preponderance of the evidence] that the defendant committed [a] prior sexual offense[s], that is not sufficient by itself to prove [beyond a reasonable doubt] that [he] [she] committed the charged crime[s]. The weight and significance of the evidence, if any, are for you to decide." (CALJIC No. 2.50.01 (1999 rev.).)

---

[30] CALJIC No. 2.01 explained that a finding of guilt could not be based upon circumstantial evidence unless the evidence not only was consistent with defendant's guilt, but could not "be reconciled with any other rational conclusion." As relevant here, the instruction further provided that "each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance on which the inference necessarily rests must be proved beyond a reasonable doubt."

[31] CALJIC No. 2.61 states: "In deciding whether or not to testify, the defendant may choose to rely on the state of the evidence and upon the failure, if any, of the People to prove beyond a reasonable doubt every essential element of the charge against him. No lack of testimony on defendant's part will make up for a failure of proof by the People so as to support a finding against him on any essential element."

In *People v. Reliford* (2003) 29 Cal.4th 1007 [130 Cal.Rptr.2d 254, 62 P.3d 601] (*Reliford*), we reviewed CALJIC No. 2.50.01, as revised in 1999. The defendant in *Reliford* "complain[ed] that, having found the uncharged sex offense true by a preponderance of the evidence, jurors would rely on 'this alone' to convict him of the charged offenses." We responded: "The problem with defendant's argument is that the instruction nowhere tells the jury it may rest a conviction solely on evidence of prior offenses. Indeed, the instruction's *next sentence* says quite the opposite: 'if you find by a preponderance of the evidence that the defendant committed a prior sexual offense . . . , that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged crime.' The jury, of course, was instructed to consider the instructions 'as a whole' (CALJIC No. 1.01), just as we must view a challenged portion 'in the context of the instructions as a whole and the trial record' to determine ' "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' [Citations.] Viewed in this way, the instructions could not have been interpreted to authorize a guilty verdict based solely on proof of uncharged conduct. (*Falsetta, supra,* 21 Cal.4th at p. 923 [CALJIC No. 2.50.01 'incorporates' the admonition 'not to convict defendant solely in reliance on the evidence that he committed prior sex offenses'].)" (*Reliford, supra,* 29 Cal.4th at p. 1013.) We added that "[n]o reasonable juror would believe [that the requirements for finding the defendant guilty of the charged offenses] could be satisfied solely by proof of uncharged offenses. Even the Court of Appeal deemed the fact 'that defendant committed the previous crime is not enough, by itself, to prove that he committed the charged offense' a 'truism.' [Citation.] Or, as other courts have stated, a conviction based solely on the uncharged conduct is 'a logical impossibility.' [Citation.]" (*Id.* at pp. 1013–1014.)

*Reliford, supra,* 29 Cal.4th 1007, also addressed the contention that CALJIC No. 2.50.01, as revised in 1999, could be interpreted as authorizing conviction of the charged offense based upon only a preponderance of the evidence. "We do not find it reasonably likely a jury could interpret the instructions to authorize conviction of the charged offenses based on a lowered standard of proof. Nothing in the instructions authorized the jury to use the preponderance-of-the-evidence standard for anything other than the preliminary determination whether defendant committed a prior sexual offense . . . . The instructions instead explained that, in all other respects, the People had the burden of proving defendant guilty 'beyond a reasonable doubt.' (CALJIC Nos. 2.61, 2.90; see CALJIC No. 10.65.) Any other reading would have rendered the reference to reasonable doubt a nullity. In addition, the jury was told that circumstantial evidence could support a finding of guilt of the charged offenses only if the proved circumstances could not be reconciled with any other rational conclusion (CALJIC No. 2.02)—which is merely

another way of restating the reasonable-doubt standard. [Citation.] The jury thus would have understood that a conviction that relied on inferences to be drawn from defendant's prior offense would have to be proved beyond a reasonable doubt." (*Reliford, supra,* 29 Cal.4th at p. 1016.)

As was the case in *Reliford, supra,* 29 Cal.4th 1007, Special Instruction No. 1 informed the jury it could "not convict [defendant] merely because you believe he committed another offense or because you believe he has a character trait that tends to predispose him to committing the charged offense," and other instructions informed the jury that the prosecution had the burden of proving the charged offenses beyond a reasonable doubt. In addition, as noted above, this burden imposed upon the prosecution was referenced in instructions concerning the sufficiency of circumstantial evidence and the defendant's decision not to testify. Defendant notes, however, that in contrast to the version of CALJIC No. 2.50.01 reviewed in *Reliford,* Special Instruction No. 1 did not include language regarding proof beyond a reasonable doubt. This difference is of no consequence, because the conclusion we reached in *Reliford* was not based upon the reference in CALJIC No. 2.50.01 to proof beyond a reasonable doubt. Thus, as in *Reliford,* we conclude there is no reasonable likelihood that the jury interpreted the instructions as a whole to authorize a conviction based upon proof by a preponderance of the evidence that defendant committed the uncharged offenses. (See *Estelle v. McGuire* (1991) 502 U.S. 62, 72–73 [116 L.Ed.2d 385, 112 S.Ct. 475] [the standard for evaluating an ambiguous jury instruction is whether, in light of the instructions as a whole and the trial record, the instruction gave rise to " 'a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution"].)

Finally, contrary to defendant's contention, Special Instruction No. 1 does not suffer from the same flaws as an instruction we reviewed in *Falsetta, supra,* 21 Cal.4th 903. The defective instruction considered in that case stated that the evidence of the defendant's uncharged sex offenses could be used only to establish his propensity to commit similar crimes; in fact, however, the evidence also properly could be considered for purposes such as establishing motive, intent, or identity. "Moreover, the proposed instruction improperly advised [jurors] to approach the other crimes evidence with caution, told them not to give the evidence undue weight, and gave them a detailed procedure on how to approach and weigh the evidence. '[I]nstructions bearing on the weight to be attached to a particular piece of evidence are properly refused.' [Citation.] Furthermore, the instruction was both lengthy and confusing in various respects." (*Id.* at pp. 922–923.) Special Instruction No. 1 does not suffer from any of the flaws affecting the validity of the instruction reviewed in *Falsetta.* Although the instruction before us included detailed guidance concerning the steps involved in determining the relevance of uncharged sexual offenses, its explanation was brief and reasonably clear.

### 5. The prosecutor's arguments related to felony murder based upon rape and to the special circumstance allegation of rape

Asserting that the People relied upon the theory that defendant killed the victim in order to have sexual intercourse with her corpse, defendant contends the trial court erred in declining to instruct the jury that the prosecution was required to prove that he harbored the intent to rape her while she was alive. Defendant claims the alleged error violated his rights to trial by jury and to a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution, and article I, sections 15 and 16 of the California Constitution.

During his closing argument, the prosecutor stated that the special circumstance allegation required a finding that the murder was committed to further the rape, and he described three possible scenarios related to this allegation: First, defendant killed the victim "to carry out or advance the commission of the crime of rape. He killed Pat Miller so he could accomplish a sexual act on her body. . . . Killed her to have sex with the body, to advance the commission of the crime of rape, to carry it out." Second, he killed her to facilitate his escape.[32] Third, his primary purpose was murder, and he raped her as an afterthought. The prosecutor explained that the special circumstance allegation would not be established in the third scenario, and argued that defendant went to the victim's apartment for sexual gratification, and killed her either to obtain what he wanted or to escape detection. In response, defense counsel requested an instruction to the jury that the prosecutor's third theory—that defendant killed Miller *before* raping her—would not support the special circumstance allegation that the victim was killed in the course of the rape. The trial court declined to give the requested instruction.

"Rape requires a live victim," because the crime must be accomplished against a person's will. (*People v. Kelly* (1992) 1 Cal.4th 495, 524 [3 Cal.Rptr.2d 677, 822 P.2d 385] (*Kelly I*).) "This does not, however, mean that intercourse after death negates the felony-murder rule, [or] the rape special circumstance . . . . Felony murder includes a killing 'committed in the perpetration of, *or attempt to perpetrate*, . . . rape . . . .' (§ 189, italics added.) . . . [T]he rape special circumstance applies to a murder 'committed while the defendant was engaged in or was an accomplice in the commission of, [or] *attempted commission of*' rape. (§ 190.2, subd. (a)(17)(iii), italics added.)" (*Ibid.*)[33] As we explained in *People v. Rundle* (2008) 43 Cal.4th 76

---

[32] The prosecutor reiterated the first two theories in his rebuttal argument: "She was killed and raped here on the living room floor. . . . [¶] . . . She died there, on the floor, unconscious from being strangled, her throat slit so [defendant] could get away with his rape."

[33] As examples, *Kelly I, supra*, 1 Cal.4th 495, cited *People v. Quicke* (1964) 61 Cal.2d 155 [37 Cal.Rptr. 617, 390 P.2d 393] and *People v. Goodridge* (1969) 70 Cal.2d 824 [76 Cal.Rptr.

[74 Cal.Rptr.3d 454, 180 P.3d 224], disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, footnote 22 [87 Cal.Rptr.3d 209, 198 P.3d 11] (*Doolin*), the felony-murder special-circumstance finding must be "based upon proof that the defendant intended to commit the underlying felony separately from forming an intent to kill the victim; that is, the felony was not merely an afterthought to the murder, as when, for example, the defendant intends to murder the victim and after doing so takes his or her wallet for the purpose of making identification of the body more difficult. [Citation.]" (*Rundle*, at p. 156.) "Therefore, although intentionally killing the victim during an attempted rape ultimately might thwart, in the legal sense, the perpetrator's goal of committing a rape, this circumstance does not mean the murder was not 'committed while the defendant was engaged in . . . the . . . attempted commission of . . . [¶] . . . [¶] . . . Rape,' which is what [section 190.2, subdivision (a)(17)(C)] requires." (*Ibid.*) Under these principles, the prosecutor's statement that defendant may have killed his victim to have sexual intercourse with her body was not inconsistent with the felony-murder theory and the special circumstance allegation.

Contrary to defendant's contention, the prosecutor did not argue that defendant's intent at all times was to have intercourse with a dead body. In addition to the prosecutor's statement, quoted above, that defendant killed Miller to have sex with her body, the prosecutor asserted that "[defendant] didn't care if the victim was alive or dead. He wanted to have sex." The prosecutor argued that defendant's attitude regarding sex established the special circumstance allegation: "I'll just take it, and I'll kill you if I have to. I'll kill you so you can't tell anyone about it. That's when the special circumstance is proven true, and that's what this case [involves], because that's what his intent was. All of his behavior, all of his statements, all of his prior conduct tell us that [defendant] had a one-track mind that night. He wanted it, and he was going to take it, and you couldn't tell him no." In

---

421, 452 P.2d 637]. In *Quicke*, the defendant strangled his victim when she resisted his attempt to rape her, drove her body to an isolated area six miles away, and had sexual intercourse with her body. We found the evidence supported the conclusion that the murder was committed in the perpetration of rape. In particular, the evidence supported "the inference that upon preconceived reflection he deliberately formed a plan to coerce the victim into engaging in intercourse with him while she was alive, or if that failed, to kill her to satisfy his desires with her corpse." (*Quicke, supra,* 61 Cal.2d at p. 159.) In *Goodridge*, the defendant strangled and beat the victim, and when she seemed to revive, repeatedly stabbed her, before having intercourse with her. The court concluded that "[w]here a defendant attempts to coerce his victim into intercourse with him, fails to accomplish his purpose while she is alive, and kills her to satisfy his desires with her corpse, the killing is first degree murder." (*Goodridge, supra,* 70 Cal.2d at p. 838.)

discussing the relevance of the rape of Christa B., the prosecutor reiterated this theory: "And he was going to get what he wanted, and you couldn't tell him no. And if he had to use deadly force, he would. He showed that from before." Finally, in his rebuttal, the prosecutor stated that the victim "couldn't say no to [defendant] that night and live because [defendant] wanted something that night."

■ Because there was no evidence or argument that defendant's intent was only to have sexual relations with a corpse, the trial court did not err in declining to instruct the jury that defendant must have harbored the intent to rape the victim while she was alive in order to find that the killing was committed during the commission or attempted commission of the crime of rape, and to find the special circumstance allegation true. The court's instructions adequately conveyed that the offense of rape requires an intent to engage in nonconsensual sexual relations with a live person. As in *People v. Carpenter* (1997) 15 Cal.4th 312 [63 Cal.Rptr.2d 1, 935 P.2d 708], "[t]he court instructed that rape requires intercourse 'against the will' of the victim 'accomplished by means of fear of immediate and unlawful bodily injury to such person.' It is not reasonably likely the jury would misconstrue these instructions as allowing rape of a dead body. [Citation.] A dead body can neither have a 'will' nor 'fear . . . bodily injury.' " (*Id.* at p. 391; see *People v. San Nicolas* (2004) 34 Cal.4th 614, 675 [21 Cal.Rptr.3d 612, 101 P.3d 509] ["a judge need not include a legally correct jury instruction when it is duplicative of other instructions provided to the jury"].)

### 6. *The prosecutor's closing argument concerning the evidence*

Defendant asserts that certain comments during the prosecutor's closing argument improperly drew attention to defendant's decision not to testify, indicated that defendant had the burden to present an affirmative defense and to prove his innocence, and disparaged defense counsel. Therefore, he claims, the comments violated his right to a fair trial and due process of law under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and article I, section 7 of the California Constitution.

During his closing argument, the prosecutor read portions of defense counsel's cross-examination of taxicab dispatcher Virginia Turner. These excerpts included defense counsel's question, whether it was true that when defendant came to the taxicab office at 2:00 a.m. on the night of the crimes, he had to knock on the door "extensively" to wake Turner up, and Turner's response, "No." The prosecutor also noted defense counsel's question, whether Turner saw a man named Reese that night, and Turner's response, "Not that I recall, no." Next, the prosecutor observed that when defense counsel asked whether Turner recalled speaking with a defense investigator in

1993, she responded, "Yes, I did." Defense counsel then inquired, "Do you recall telling him that a gentleman named Reese was out in the parking lot at the carports along with David Hargrove, Brian Jones, [and defendant]?" Turner answered, "I don't recall." Finally, defense counsel asked Turner, "Do you also recall telling him that approximately 10:00 in the evening, you saw Michael and Reese walking through the alley?" Turner responded, "I don't recall."

After reading these portions of the cross-examination of Turner, the prosecutor urged the jury to "[l]ook at the question. What's the insinuation? The insinuation is that she did say those things previously, and it puts in your mind the thought that [defendant] is with Reese walking around the alley and is seen by people there. But there's no evidence of that, only the defendant's statement when he's trying to use this person, Reese, as an alibi for this missing time gap that he has. Had Virginia Turner actually said these things to a defense investigator, don't you think they would have produced the defense investigator to say, 'Yeah. I interviewed her. Here's what she said.' [¶] You can conclude from the fact that the defense investigator wasn't presented to you that these insinuations are false, and all they can do possibly is mislead you as to what the evidence is in this case."

After the prosecutor concluded the first portion of his closing argument, and outside the presence of the jury, defense counsel stated that the defense team had been unable to locate the investigator who conducted interviews of witnesses in 1993, before these attorneys represented defendant. He stated: "There are reasons why we could not find him that we could not present to the jury. There are reasons between [cocounsel] and myself why we decided that that impeachment was not necessary. Questions were asked of witnesses in regard to reports and statements that they gave to that investigator and asked if they recalled those statements." He asserted the prosecutor's argument constituted impermissible commentary upon defense counsel's decision to call or not call witnesses, and requested the court to instruct the jury again pursuant to CALJIC No. 2.11: "Neither side is required to call as witnesses all persons who may have been present at any of the events disclosed by the evidence or who may appear to have some knowledge of these events. Neither side is required to produce all objects or documents mentioned or suggested by the evidence."

The trial court stated it had not previously heard of any problem in locating an investigator, and expressed the view that "[t]he problem here is that if you didn't talk to the witnesses or interview the witnesses or they wouldn't talk to you, which is oftentimes the case, . . . to see what their response would be without having the witness available to back it up, it's a risk. And if the person, as in this case, testifies they don't remember saying that, then you're

left with an empty sack, so to speak, because you have no way of bringing it forward. But it doesn't prevent the prosecution from commenting as was done in this particular case." The court concluded it was not necessary to reinstruct the jury with CALJIC No. 2.11.

There is no merit in defendant's contention that the trial court should have reinstructed the jury that neither side was required to call all potential witnesses, because defendant has not established that the prosecutor argued that a party was required to call all potential witnesses.[34] Defendant's additional contentions fail because—defendant having failed to raise them below—they are forfeited on appeal, and because they lack merit in any event.

Although the exchange described above reflects that defense counsel complained only that the prosecutor's argument constituted impermissible comment upon defense counsel's decision to call or not call witnesses, defendant now claims he "objected that the prosecutor's comments were an improper back-door comment on defendant's silence . . . ." In support of this assertion, he relies upon an objection made by his counsel *earlier* during the prosecutor's closing argument. Our review of the record, however, reflects that the earlier objection related to the prosecutor's stated intention to highlight *representations made in the defense opening statement* that were not proved; the earlier objection did not address the prosecutor's stated intention to highlight *insinuations made through the cross-examination of witnesses.*[35] Therefore, defendant forfeited the claim that the prosecutor's statements concerning insinuations made through cross-examination constituted an improper comment upon defendant's silence. (*People v. Bradford* (1997) 15

---

[34] The People contend that this objection was forfeited because defendant did not interrupt the prosecutor's closing argument to object, and instead waited until the prosecutor had finished the first part of his closing arguments, only then complaining about the comments and requesting that CALJIC No. 2.11 be read again. Because defendant sought only a rereading of a jury instruction, he did not forfeit his claim by delaying until the prosecutor had finished.

[35] At an *earlier* point in his closing argument, the prosecutor stated he would highlight "a few things that were brought out in defense opening statement that never materialized into evidence and in questions, insinuations that were made during cross-examination of various witnesses that never materialized into evidence." Defense counsel argued to the trial court that "[b]y *commenting on [defense counsel's] opening statement[,]* which is not evidence[,] and *commenting on the fact that he did not produce what he said he would produce in the opening statement,* he is commenting on that as evidence and through the back door commenting on the defendant's silence and his not testifying, which is impermissible . . . ." (Italics added.) Although the prosecutor stated at this earlier point in the proceedings that he would identify "insinuations . . . that never materialized into evidence," defendant's objection to the prosecutor's statement addressed only the prosecutor's intention to comment upon the defense's failure to substantiate representations made in its opening statement. Both the prosecutor's response to the objection and the ensuing ruling by the trial court also focused solely upon the propriety of the prosecutor's comment upon the absence of evidence supporting the representations made during the defense's opening statement.

Cal.4th 1229, 1333 [65 Cal.Rptr.2d 145, 939 P.2d 259] (*Bradford*).) Similarly, defendant has not cited anything in the record establishing that he claimed below that the prosecutor's comments concerning the cross-examination of Turner shifted the burden of proof to defendant to prove his whereabouts on the evening of the crimes, or that these comments disparaged defense counsel. He has therefore forfeited these claims. (*Ibid.*)

■ In any event, had defendant preserved these claims, they would fail. First, with respect to defendant's right not to testify, "[i]t is now well established that although *Griffin* [*v. California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]] prohibits reference to a defendant's failure to take the stand in his own defense, that rule 'does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses. [Citations.]' [Citations.]" (*People v. Vargas* (1973) 9 Cal.3d 470, 475 [108 Cal.Rptr. 15, 509 P.2d 959].) The prosecutor's comments merely drew attention to the absence of the investigator as a witness for the defense, rather than to defendant's absence from the witness stand.[36] Had defendant testified, he might have contradicted Turner's recollection, but this possibility does not transform the prosecutor's observations into a veiled comment upon defendant's decision not to testify. (See *People v. Johnson* (1992) 3 Cal.4th 1183, 1229 [14 Cal.Rptr.2d 702, 842 P.2d 1] [a prosecutor may not claim that evidence is uncontradicted if the defendant is the only person who could refute the evidence, but if others could have contradicted the evidence the prosecutor may comment upon the state of the evidence].)

Second, with respect to the burden of proof, the prosecutor's comments merely established that, contrary to insinuations made during cross-examination, Turner's testimony was unimpeached. There is no reasonable likelihood the jury would have understood the prosecutor's remarks to suggest that defendant had the burden to establish his own whereabouts that evening. (*People v. Clair* (1992) 2 Cal.4th 629, 662–663 [7 Cal.Rptr.2d 564, 828 P.2d 705] [in evaluating claims concerning prosecutorial remarks, the test is "whether there is a reasonable likelihood that the jury misconstrued or misapplied the words"].)[37]

---

[36] Defendant contends it was improper to comment on the absence of a witness who was "unavailable," but the defense did not establish that the investigator was unavailable. (See Evid. Code, § 240 [describing circumstances establishing that a witness is unavailable].)

[37] Defendant relies upon *People v. Gaines* (1997) 54 Cal.App.4th 821 [63 Cal.Rptr.2d 188] in support of his contention that the prosecutor's arguments indicated defendant had a duty to call certain witnesses, and shifted the burden of proof to defendant. In *Gaines*, the prosecutor commented not only upon the absence of a particular witness to corroborate the defendant's version of events, but further asserted that the witness's testimony would have conflicted with the defendant's testimony, that the defense had " 'got [the witness] out of here,' " and that the prosecution had tried to call the witness when it became clear the defense would not do so.

Third, with respect to comments that assertedly disparaged defense counsel, defendant complains of only the following statement: "You can conclude from the fact that the defense investigator wasn't presented to you that these insinuations are false, and all they can do possibly is mislead you as to what the evidence is in this case." This statement challenges the insinuations—not the character—of defense counsel. (See *People v. Thompson* (1988) 45 Cal.3d 86, 112 [246 Cal.Rptr. 245, 753 P.2d 37] ["A prosecutor may vigorously argue his case, marshalling the facts and arguing inferences to be drawn therefrom."].) In contrast, the case law upon which defendant relies involves direct attacks upon defense counsel and the jury. (*People v. Haskett* (1982) 30 Cal.3d 841, 866 [180 Cal.Rptr. 640, 640 P.2d 776] [prosecutor suggested during penalty phase closing arguments that jurors who had voted to acquit on certain counts acted in disregard of the law]; *People v. Pitts* (1990) 223 Cal.App.3d 606, 705 [273 Cal.Rptr. 757] [prosecutor accused defense counsel of contributing to the ruination of a witness's life and of knowingly presenting perjured testimony].) Nothing in the prosecutor's arguments in the present case may be characterized as a deceptive or reprehensible means to persuade the jury. (See *People v. Price* (1991) 1 Cal.4th 324, 447 [3 Cal.Rptr.2d 106, 821 P.2d 610] ["In general, a prosecutor commits misconduct by the use of deceptive or reprehensible methods to persuade either the court or the jury."].) Nor did the prosecutor's arguments render "[defendant's] trial so fundamentally unfair as to deny him due process." (*Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 645 [40 L.Ed.2d 431, 94 S.Ct. 1868]; see *People v. Harris* (1989) 47 Cal.3d 1047, 1084 [255 Cal.Rptr. 352, 767 P.2d 619] ["prosecutorial misconduct implicates the defendant's federal constitutional rights only if it is so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process"].)

### 7. *Juror No. 9's discussions with her husband*

Defendant contends that Juror No. 9 should have been dismissed for misconduct, based upon a conversation she had with her husband during guilt phase deliberations. Defendant asserts that the trial court's failure to dismiss

---

"The prosecutor was in plain effect presenting a condensed version of what he was telling the jury would have been [the absent witness's] testimony. When this tactic is achieved in the guise of closing argument, the defendant is denied Sixth Amendment rights to confrontation and cross-examination. [Citations.]" (*Id.* at p. 825.) Defendant also relies upon *People v. Klor* (1948) 32 Cal.2d 658 [197 P.2d 705] (in light of the law providing that a spouse was not a competent witness against his or her spouse, the prosecutor's comments concerning the failure of the defendant's wife to testify were improper), and *People v. Benc* (1900) 130 Cal. 159 [62 P. 404] (prosecutor noted that defendant had not called certain witnesses; trial court properly directed jurors to disregard the comments). These cases do not support the conclusion that the prosecutor's observations in the present case were improper.

this juror violated defendant's right to an impartial jury and his right to a reliable verdict under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

The jury first met to deliberate at 4:00 p.m. on Tuesday, February 24, 1998. None of the jurors volunteered to serve as the foreperson. They therefore drew numbers, and the juror whose number was selected agreed to serve as foreperson. The foreperson then conducted a poll concerning the jurors' views on the issue of guilt, but declined to reveal the results of the poll to the other jurors, who left for the day. At home that evening, Juror No. 9 expressed frustration to her husband that the foreperson would not reveal the results of the secret poll. Her husband asked why the foreperson would not disclose this information, and the juror responded that the foreperson had said he was not allowed to share the results with the other jurors. She did not discuss any substantive matters involving the case with her husband.

Juror No. 9's husband was a former police officer and Riverside County Sheriff's Deputy, and recently had been hired as a senior investigator by the Riverside County District Attorney's Office, which was prosecuting this case. The next day, Juror No. 9's husband informed Lodric Clark, the investigator from the Riverside District Attorney's Office who was assisting in the prosecution of the case, of the information Juror No. 9 had revealed to him. Clark communicated this information to the prosecutor in this case. When the husband of the juror returned home that evening, he told her he had spoken to Clark about the matter, and the juror became very upset with her husband for having done so. Her husband then called Clark to report that his wife was very upset. At 10:00 that evening, Clark contacted the prosecutor concerning Juror No. 9's response.

The prosecutor contacted the court and requested a hearing to address the matter. At the hearing, he described these events to the court, and explained that the initial information he received "contained no substance of jury deliberations, just administerial function of selecting a foreperson. I'm not sure that this amounts to jury misconduct. What concerned me is that juror nine was now upset and that that might somehow affect her deliberations, so I think it's something that the court needs to make inquiry into or any other such remedy as might be appropriate." One of defendant's attorneys agreed with the district attorney, and expressed the view that "possibly the wisest thing to do before we make any decision is to talk to her, get her feelings about things, and then once we've had a chance to listen to what she has to say, then we can make a decision based on the information that's in front of us." Defendant's other attorney expressed "concern . . . that we're singling out a juror, and we haven't heard . . . about anything substantive in regard to the case itself. And I think it might be better if the court just admonished the

jury an additional time that they're not to talk about the case with anyone outside. [¶] Now, I do understand [the district attorney's] concern about the anger the juror might have with her husband, and so I suppose we might need to make an inquiry in regard to that, whether that would affect her deliberations or not."

The trial court proposed to have Juror No. 9 come into court, and to "simply ask her if she has any problems or feels that she can be fair to both sides to continue in the case." One of defendant's counsel asked, "[h]as any problems with us or with her husband?" The trial court responded, "[w]ith her husband. Well, I'm going to say any problem with the situation." The prosecutor suggested that the court ask Juror No. 9 whether she spoke to her husband "about any of the substantive deliberations, about the facts." He added that "if she hasn't, I don't think anybody wants his input into the deliberations through her. That's the whole idea why people aren't supposed to discuss it with anyone. So just make that verification, I think we can put this matter to rest." Defense counsel responded, "I agree." Following a brief discussion in which defendant waived his presence at the hearing, the trial court stated, "I think probably what I'm going to do is simply state that I understand that she may have had some discussions with her husband about the case and ask her what it was that she discussed, without pinpointing it." Defense counsel responded, "That's fine."

In accordance with these discussions, Juror No. 9 was brought into the courtroom and was asked whether she discussed the case with her husband and, if so, "what did you talk to him about?" Juror No. 9 explained that the foreperson took a poll on the first day of deliberations and would not disclose the results to the other jurors. "And I was very frustrated, so I went home and I burst in the door and I [said], 'I'm so frustrated.' " She recounted telling her husband how the foreperson had been picked, and that when the foreperson agreed to serve, he and the other jurors said they would help each other. "And so I was so frustrated, . . . he won't even tell us where we stand." She testified that her husband asked her why the foreperson would not tell her, and she responded that the foreperson claimed the judge said he could not reveal the results. She added that when she returned to court the next day, she read through the jury instructions "to see if there was anything in there, and there wasn't. Then I got to thinking well, it's not going to change the outcome any. It's just my frustration. But that's all I said, I swear." The trial court then asked, "You didn't talk to your husband about anything else other than that?" Juror No. 9 responded, "No, just I was so frustrated and venting."

The court explained that if she believed the foreperson or anyone else was not following the rules during deliberations, she should bring the matter to the court's attention. It then acknowledged that "you feel somewhat like you've been singled out and brought in here. Do you feel this is going to affect you in any way in your deliberations or your continued deliberations in this case?" Juror No. 9 responded, "No." Before concluding its questioning, the court confirmed Juror No. 9's responses. First, "all we wanted to do was inquire as to whether you had discussed the substantive matters about the case, and you're indicating that you did not; that all you talked about was your frustration with the foreperson when you asked him what the breakdown of the vote was." Juror No. 9 responded, "Right." Second, "the other thing we wanted to find out is whether or not any of these experiences, including having us talk to you individually, is going to affect your ability to be fair and impartial to both sides in this case, and will it?" She responded, "No," and added, "I want to make sure that I give every benefit of the doubt. I don't want anything in my life to have affected my decision. . . . I truly strongly feel that way." The court concluded by asking, "Counsel have anything?" The district attorney and both defense counsel responded in the negative. Juror No. 9 then interjected, "But I do want to say that if you have any question, any question, I don't want you to wonder, truly I don't." Defense counsel responded, "I have no questions. I think you said it quite well." Juror No. 9 then apologized, and defense counsel and the trial court both told her that she had not done anything wrong.

As revealed by our summary of the trial court's inquiry, defense counsel agreed that if the trial court verified that Juror No. 9 had not discussed with her husband any substantive deliberations of the jury, "we can put this matter to rest." Defense counsel also agreed with the court's intended inquiry, and stated at the conclusion of the inquiry that he had no questions. At no time did defense counsel object to Juror No. 9's continued service, or request a mistrial on the ground of juror misconduct. Therefore, defendant has forfeited this claim. (*People v. Stanley* (2006) 39 Cal.4th 913, 950 [47 Cal.Rptr.3d 420, 140 P.3d 736].)

Defendant contends, however, that his failure to object or to move for a mistrial is not fatal, because the reasons why the juror should have been discharged were obvious, and further objection was unnecessary. Contrary to defendant's assertion, his theory on appeal—that Juror No. 9's conversation with her husband "strongly suggests a lack of impartiality on her part"—was not apparent in the trial court, and required explanation in the circumstances of this case. Because defendant failed to request that Juror No. 9 be discharged or that a mistrial be declared, the trial court had no occasion to consider these issues.

Even if the claim had not been forfeited, it would fail. "It is misconduct for a juror during the course of trial to discuss the case with a nonjuror. [Citation.]" (*People v. Danks* (2004) 32 Cal.4th 269, 304 [8 Cal.Rptr.3d 767, 82 P.3d 1249] (*Danks*).) "In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial . . . . The presumption is not conclusive, but the burden rests heavily upon the Government to establish . . . that such contact with the juror was harmless to the defendant. [Citations.]" (*Remmer v. United States* (1954) 347 U.S. 227, 229 [98 L.Ed. 654, 74 S.Ct. 450].) The presumption of prejudice " 'may be rebutted . . . by a reviewing court's determination, upon examining the entire record, that there is no substantial likelihood that the complaining party suffered actual harm.' [Citations.]" (*People v. Leonard* (2007) 40 Cal.4th 1370, 1425 [58 Cal.Rptr.3d 368, 157 P.3d 973] [a review of the record established that there was no substantial likelihood that the defendant was prejudiced by jurors' violation of the trial court's admonition not to discuss the defendant's failure to testify]; see also *Danks, supra*, 32 Cal.4th at p. 303 [the effect of a juror's receipt of extraneous material " 'is judged by a review of the entire record . . . . The verdict will be set aside only if there appears a substantial likelihood of juror bias.' "].) "Whether prejudice arose from juror misconduct . . . is a mixed question of law and fact subject to an appellate court's independent determination. [Citations.]" (*People v. Nesler* (1997) 16 Cal.4th 561, 582 [66 Cal.Rptr.2d 454, 941 P.2d 87].)

The information obtained through the inquiry of Juror No. 9 rebutted the presumption of prejudice. The juror confirmed she had revealed only the manner in which the jury picked the foreperson and the foreperson's refusal to reveal the results of the first jury poll, and that her conversation with her husband involved nothing substantive. She also confirmed that the incident and the trial court's inquiry would not affect her ability to be fair and impartial.[38] The trial court's questions and Juror No. 9's responses established that the juror's conversation with her husband "is not, judged objectively, 'inherently and substantially likely to have influenced the juror.' [Citation.] Nor does it objectively demonstrate a substantial likelihood, or even a reasonable possibility, of actual bias. [Citations.]" (*People v. Loker* (2008) 44 Cal.4th 691, 754–755 [80 Cal.Rptr.3d 630, 188 P.3d 580] (*Loker*).)[39]

---

[38] Contrary to defendant's contentions, the trial court's inquiries were reasonably calculated to elicit from Juror No. 9 all relevant information, and the trial court was not required to confirm in greater detail exactly what Juror No. 9 did *not* discuss with her husband.

[39] Defendant cites no authority requiring different or additional analysis in connection with his contention that the failure to dismiss Juror No. 9 violated his right to a reliable verdict under the Eighth Amendment. (See *People v. Williams* (1997) 16 Cal.4th 635, 666 [66 Cal.Rptr.2d 573, 941 P.2d 752] ["the due process clause of the Fourteenth Amendment . . .

### 8. *Asserted cumulative error*

Defendant contends the claimed errors, considered together, establish a violation of his constitutional rights and require reversal under *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824] (*Chapman*). We have found no error at the guilt phase, and thus there is no error to consider cumulatively.

### B. *Penalty phase*

### 1. *Trial court's denial of a continuance*

On the day the jury reached a verdict on defendant's guilt, the trial court declined to grant defendant a continuance of one day, and ordered the penalty phase to begin the next day. Defendant contends the trial court abused its discretion, and that the denial of a continuance violated his rights to due process of law, to effective assistance of counsel, to present a defense, and to a fair and reliable determination of penalty, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and under article I, section 15 of the California Constitution.

"The decision whether to grant a continuance of a hearing to permit counsel to secure the presence of a witness rests in the sound discretion of the trial court." (*People v. Roybal* (1998) 19 Cal.4th 481, 504 [79 Cal.Rptr.2d 487, 966 P.2d 521].) We find no abuse of discretion in the circumstances of this case. Because the guilt phase of the trial exceeded the expected time, the trial court was concerned that jurors would have commitments that would cause them to rush their penalty phase deliberations. The trial court undertook to balance that concern against defendant's asserted need for an additional day to arrange for his witnesses to be transported to the trial. Although the court ordered that the People's case would begin the next day, it acknowledged the difficulties in arranging transportation and stated that "we'll work with whatever schedules we have to work with." On the first day of the penalty phase, defense counsel informed the court that all of defendant's witnesses would be available to testify at 1:30 p.m. the next day. When two of defendant's witnesses did not arrive in time to testify on the second day of the penalty phase, the trial court scheduled time for further testimony on the following day. The defense did not produce these two witnesses on the third day of the penalty phase; instead, defense counsel informed the court that the defense would not call any additional witnesses. The defense did not indicate that this development was attributable to an inability to arrange for the witnesses' presence. Thus, although the trial court declined to delay *the*

---

requires the sentencing jury to be impartial to the same extent that the Sixth Amendment requires jury impartiality at the guilt phase of the trial"].)

*People's* presentation of evidence, it did not compel defendant to proceed with his case in the absence of his witnesses.

Defendant contends the denial of a continuance deprived his counsel of a reasonable opportunity to prepare defense witnesses to testify. Defense counsel repeatedly stated that a continuance was required to arrange transportation, and never indicated that additional time was required to prepare witnesses. It was the trial court that noted that defense counsel would "probably want to sit down and talk to your witnesses." When defense counsel responded by proposing that the next day's session begin at 11:00 a.m., the trial court agreed. Under these circumstances, defendant cannot be heard to complain that the trial court denied him adequate time to prepare his witnesses.

Because the trial court did not compel defendant to proceed in the absence of his witnesses, and accommodated defense counsel's request that the court session be delayed to allow time to prepare his witnesses, defendant was not deprived of his right to due process of law, his right to the effective assistance of counsel, his right to present a defense, or his right to a fair and reliable determination of penalty.

### 2. *Jury instructions related to defendant's prior conviction*

Defendant contends the trial court's instruction concerning consideration of evidence of defendant's *conviction* of the forcible rape of Christa B. failed to inform the jury that it could not consider evidence of any *other criminal activity* as an aggravating factor under section 190.3, factor (c)—which concerns only *convictions*—and thereby violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

Evidence was presented that defendant committed various criminal acts against Christa B. (the acquaintance whom he assaulted) and Debra G. (defendant's former girlfriend whom he assaulted), and that defendant was convicted of the forcible rape of Christa B. (See § 190.3, factors (b), (c) [in determining the penalty, the trier of fact shall take into account any criminal activity that involved the use of force or violence, and any prior felony conviction].) With respect to the conviction of forcible rape, which was relevant to factor (c) of section 190.3, the trial court gave a modified version of CALJIC No. 8.86: "Evidence has been introduced for the purpose of showing that the defendant has been convicted of the crime of forcible rape, 261 of the Penal Code, prior to the offense of murder of the first degree of which he has been found guilty in this case. [¶] Before you may consider such alleged crime as an aggravating circumstance in this case, you must first be satisfied beyond a reasonable doubt that the defendant was in fact

convicted of such prior crime." The trial court did not read the final sentence of the standard version of CALJIC No. 8.86: "You may not consider any evidence of any other crime as an aggravating circumstance."[40]

Next, the trial court instructed the jury concerning evidence of other criminal acts allegedly committed by defendant against Christa B. and Debra G., which were relevant to factor (b) of section 190.3. The trial court read a modified version of CALJIC No. 8.87, which identified the various alleged criminal acts, and instructed that "[b]efore a juror may consider any criminal acts or activity as an aggravating circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the defendant . . . did in fact commit the criminal acts or activity. A juror may not consider any evidence of any other criminal acts as an aggravating circumstance. [¶] . . . If any juror is convinced beyond a reasonable doubt that the criminal activity occurred, that juror may consider that activity as a fact in aggravation. If a juror is not so convinced, that juror must not consider that evidence for any purpose."[41]

"In assessing the instruction to determine whether the jury was adequately guided under the Eighth or Fourteenth Amendment, we look to whether it is reasonably likely the jury understood the instruction and correctly applied it." (*Maury, supra*, 30 Cal.4th at p. 443.) The two instructions informed the jurors that (1) before a juror could consider evidence that defendant was convicted of forcible rape, the juror had to be satisfied beyond a reasonable doubt that defendant was in fact convicted of forcible rape, (2) before a juror could

---

[40] When the proposed jury instructions were discussed, the trial court expressed to counsel the view that the final sentence of CALJIC 8.86 did not apply in the present case. Defendant proposed instead that the final sentence state: "You may not consider any evidence of any other crime as an aggravating circumstance under factor (c)," which addresses convictions. The trial court responded that the proposed instruction would be confusing, because the jurors also would be instructed that they could consider evidence of other offenses of which defendant had not been convicted.

[41] The trial court's instruction pursuant to CALJIC No. 8.87 stated in full: "Evidence has been introduced for the purpose of showing that the defendant, MICHAEL BERNARD LEWIS, has committed the following criminal acts or activity which involved the express or implied use of force or violence or the threat of force or violence: Pertaining to CHRISTA [B.]—Forcible Rape in violation of Penal Code section 261, subdivision (a), subsection (2), Attempted Murder in violation of Penal Code section 664/187, and/or Battery with Serious Bodily Injury in violation of Penal Code section 243, subdivision (d). Pertaining to Debra [G.]—Forcible Rape in violation of Penal Code section 261, subdivision (a), subsection (2), and/or Battery in violation of Penal Code section 242. Before a juror may consider any criminal acts or activity as an aggravating circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the defendant, MICHAEL BERNARD LEWIS, did in fact commit the criminal acts or activity. A juror may not consider any evidence of any other criminal acts as an aggravating circumstance. [¶] It is not necessary for all jurors to agree. If any juror is convinced beyond a reasonable doubt that the criminal activity occurred, that juror may consider that activity as a fact in aggravation. If a juror is not so convinced, that juror must not consider that evidence for any purpose."

consider evidence that defendant had committed various violent criminal acts against Christa B. and Debra G., the juror had to be satisfied beyond a reasonable doubt that defendant did in fact commit the criminal acts or activity, and (3) a juror could not consider any evidence of any other criminal acts as an aggravating circumstance.

Defendant asserts that the instructions failed to inform the jury that *under factor (c)* of section 190.3, the jury could consider only defendant's prior conviction for forcible rape against Christa B., and could not consider any evidence of other crimes or criminal activity, such as his criminal actions with respect to Christa B. and Debra G., for which he was not convicted of any crime. We do not discern how a juror could conclude from these instructions that evidence of such other criminal activity could be viewed as aggravating evidence under factor (c). The instruction that related to factor (c)—modified CALJIC No. 8.86—referred only to evidence of a *conviction* of forcible rape. As the trial court observed, in light of the circumstance that it would be instructing the jury concerning evidence of other criminal activity as an aggravating circumstance, it would have been confusing to instruct the jury, in connection with its instruction concerning evidence of convictions, that it could "not consider evidence of any other crime as an aggravating circumstance." Moreover, the only evidence presented at trial of a prior conviction was the conviction for the forcible rape of Christa B. No reasonable juror could have concluded that the evidence of other criminal activity committed against Christa B. and Debra G. could establish beyond a reasonable doubt that defendant was *convicted* of the alleged criminal acts, and therefore constituted aggravating evidence of a prior conviction under factor (c). Therefore, we conclude it is not reasonably likely that the jury misunderstood the instructions concerning other criminal acts or incorrectly applied them. (*Maury, supra,* 30 Cal.4th at p. 443.)

### 3. *Failure to instruct on lingering doubt as to guilt*

Defendant contends the trial court's refusal to instruct the jury that it could consider lingering doubt concerning defendant's guilt, in determining the appropriate penalty, violated his rights to due process of law, a fair trial, and a fair and reliable determination of penalty under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, and his parallel rights under the California Constitution.

Defendant requested the following instruction: "1. The adjudication of guilt is not infallible and any lingering doubts you entertain on the question of guilt may be considered by you in determining the appropriate penalty, including the possibility that at some time in the future, facts may come to light which have not yet been discovered. [¶] 2. It may be considered as a

factor in mitigation if you have a lingering doubt as to the guilt of the defendant." The trial court refused to give this instruction, stating that the topic was addressed by factor (k) of section 190.3 and CALJIC No. 8.85, and observing that the language of the proposed instruction called upon the jury to speculate concerning facts that might be discovered in the future. The trial court allowed defense counsel to argue to the jury that it should consider lingering doubt, but instructed counsel not to invite the jury to speculate concerning the discovery of facts in the future.

■ Although a defendant may assert his or her possible innocence in mitigation, and the jury may consider lingering doubt in determining the appropriate penalty, there is no requirement that the court specifically instruct the jury to consider lingering doubt. (*People v. Page* (2008) 44 Cal.4th 1, 55 [79 Cal.Rptr.3d 4, 186 P.3d 395] (*Page*); see also § 190.3, factors (a) [the trier of fact shall take into account the circumstances of the crime and any special circumstance found to be true], (k) [the trier of fact shall take into account any other circumstance in mitigation].) In the present case, the trial court permitted defendant to assert his innocence, and the defense articulated to the jury why it believed the jurors should have lingering doubt concerning their verdict.

■ Defendant claims, however, that the prosecutor argued to the jury that the jurors could not consider lingering doubt, and contends that this circumstance mandated the giving of an instruction that lingering doubt was a mitigating factor. Defendant did not object to the prosecutor's closing argument or request any further instruction in response to the closing argument. (See *Bradford, supra,* 15 Cal.4th at p. 1333 [the defense must make a timely objection to preserve a claim of prosecutorial misconduct, and such a claim is reviewable only if an admonition would not have cured the harm].) Moreover, the record reflects that, although the prosecutor argued the jury should have no doubt concerning its verdict, he did not tell the jurors they could not consider lingering doubt as a mitigating factor.[42]

---

[42] The prosecutor challenged the view that circumstantial evidence and testimony from individuals "of questionable background and integrity" were insufficient to support a verdict of death. He reminded the jurors that they had found defendant guilty beyond a reasonable doubt, and asserted that defendant's false statements "scream out to you, 'I'm the one who did this. . . .' " The prosecution then argued there was no lingering doubt: "There is certainty to the evidence, ladies and gentlemen, there is no lingering doubt: Your verdict was the correct one based upon the evidence and you know that. This is not the time, this is not the place to relitigate the case or your determination of the special circumstances. [¶] The Defense wants to argue that, perhaps, you have some leftover doubt. I would suggest to you that this whole concept of lingering doubt is nothing but a distraction. Analyze it for what you want, it is that gray area between beyond all reasonable doubt and all possible or imaginary doubt that they wish to distract you to analyze, and it is not required, it is not necessary. [¶] The standard 'beyond a reasonable doubt' can't get much higher, ladies and gentlemen, *it cannot get much*

▆▆▆ Defendant also claims the circumstance that an instruction specifically addressing lingering doubt may be given in some capital cases, and rejected in others, reflects improper inconsistency in application of the death penalty. The sole authority he cites in support of this proposition is *Eddings v. Oklahoma* (1982) 455 U.S. 104 [71 L.Ed.2d 1, 102 S.Ct. 869], which holds that the sentencer in a capital case must be allowed to consider any relevant mitigating factor. (*Id.* at p. 112 ["a consistency produced by ignoring individual differences is a false consistency"].) The jury in the present case was instructed to "take into account and be guided by" various factors, including "[a]ny other circumstance that extenuates the gravity of the crime. . . ." (CALJIC No. 8.85; see § 190.3, factor (k).) Thus, the instructions in the present case comply with the holding of *Eddings v. Oklahoma.* There is no requirement that identical instructions concerning mitigating circumstances be given to every capital jury.

### 4. *Instruction concerning the jury's discretion and deliberative process*

Defendant contends that CALJIC No. 8.88 (1989 rev.), which instructed the jury concerning the weighing of aggravating and mitigating factors, violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. As defendant acknowledges, we previously have considered and rejected these contentions.[43]

▆▆▆ First, defendant claims the instruction did not convey the requirement that the jury impose a sentence of life imprisonment without the possibility of parole if the mitigating circumstances outweigh the aggravating circumstances. (See § 190.3.) CALJIC No. 8.88 explains, however, that "[t]o return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." This statement adequately explains the circumstances in which the jury may return a verdict of death. (*Page, supra,* 44 Cal.4th 1, 57; *People v. Moon* (2005) 37 Cal.4th 1, 42–44 [32 Cal.Rptr.3d 894, 117 P.3d 591] (*Moon*).) In particular, it "highlights the significant burden that must be satisfied before a verdict of death may be returned, and thereby conveys that life in prison without the

---

higher. When we come down to a criminal trial as independent jurors—if you are witnesses, perhaps, then you had no possible doubt, a hundred percent sure—but in any criminal case you have to rely on what people show you, tell you and what circumstantial evidence proves to you. That is in every criminal case. You couldn't be witnesses and be jurors at the same time."

[43] The Attorney General asserts defendant forfeited his claims by failing to object to CALJIC No. 8.88 in the trial court. Because defendant's contentions raise issues concerning his substantial rights, we address them despite his failure to object below. (§ 1259.)

possibility of parole is the appropriate punishment if this burden is not met." (*Page, supra*, 44 Cal.4th at p. 57.)

Next, defendant claims CALJIC No. 8.88 "improperly suggested that a quantitative comparison of the 'totality' of mitigating factors was required," and failed to convey the principle that one mitigating factor may outweigh all aggravating factors. The instruction explained that "[t]he weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider." Thus, "CALJIC No. 8.88 properly describes the weighing process as ' "merely a metaphor for the juror's personal determination that death is the appropriate penalty under all of the circumstances." ' [Citation.]" (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1161 [124 Cal.Rptr.2d 373, 52 P.3d 572].) "As we have repeatedly explained, the standard jury instructions . . . 'are adequate to inform the jurors of their sentencing responsibilities in compliance with federal and state constitutional standards.' [Citations.]" (*Kelly II, supra*, 42 Cal.4th at p. 799 [trial court need not instruct that "a single mitigating factor could outweigh a number of aggravating factors"].)

Finally, defendant contends the instruction's description of "mitigation" improperly focused upon "the crime in question," misled the jury to believe it could consider only the circumstances of the crimes, and failed to inform the jury of the full range of evidence it could consider in mitigation. In support of his contention, defendant cites empirical research concerning jurors' understanding of penalty phase jury instructions. As we previously have held, "[t]he definition of mitigation included in CALJIC No. 8.88 . . . [does] not fail to explain that concept adequately. [Citation.] We are not persuaded otherwise by defendant's citation to certain empirical research, not part of the record and not subject to cross-examination, suggesting that substantial numbers of persons, given the standard instruction, misunderstand mitigation as limited to the circumstances of the capital crime." (*People v. Boyer* (2006) 38 Cal.4th 412, 486 [42 Cal.Rptr.3d 677, 133 P.3d 581], fn. omitted (*Boyer*);[44] see *People v. Welch* (1999) 20 Cal.4th 701, 772–772 [85 Cal.Rptr.2d 203, 976 P.2d 754]; see also *People v. Brasure* (2008) 42 Cal.4th 1037, 1066 [71 Cal.Rptr.3d 675, 175 P.3d 632] [trial court did not err by

---

[44] In both *Boyer, supra*, 38 Cal.4th at page 486, footnote 56, and the present case, the jury was instructed that " '[a] mitigating circumstance is any fact, condition or event which as such, does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty.' "

omitting definitions of "aggravating" and "mitigating," because "such a definitional instruction is not required for these commonly understood terms"].)

5. *Impartiality and parity of instructions (CALJIC Nos. 8.85, 8.87)*

Defendant contends the trial court failed to ensure impartiality and parity in the jury instructions, in violation of his right to a fair and reliable penalty determination under the Eighth and Fourteenth Amendments to the United States Constitution.[45]

 Defendant notes that CALJIC No. 8.87 instructed the jurors that it was unnecessary for all of them to agree whether defendant engaged in unadjudicated criminal activity with respect to Christa B. and Debra G., but that CALJIC No. 8.85, which described the factors to be considered in determining the appropriate penalty, did *not* instruct that it was unnecessary for all jurors to agree with respect to mitigating circumstances. He acknowledges that a defendant is not entitled to an instruction that the jury need not reach a unanimous conclusion with respect to mitigating factors (*People v. Breaux* (1991) 1 Cal.4th 281, 314–315 [3 Cal.Rptr.2d 81, 821 P.2d 585]), but contends that inclusion of such an instruction with respect to unadjudicated criminal activity mandates its inclusion with respect to mitigating factors.

We rejected this theory in *People v. Holt* (1997) 15 Cal.4th 619 [63 Cal.Rptr.2d 782, 937 P.2d 213], in which we explained that additional instructions "adequately informed the jury that resolution of penalty phase factual questions as well as deciding the appropriate penalty was an individual responsibility." (*Id.* at p. 686.) As in *Holt*, the court in the present case instructed the jurors that "[t]he People and the defendant are entitled to the *individual opinion* of each juror. [¶] Each of you must consider the evidence for the purpose of reaching a verdict if you can do so. *Each of you must decide the case for yourself,* but you should do so only after discussing the evidence and instructions with the other jurors." (Italics added.) As in *Holt*, we conclude that the jury would not have inferred from the instructions that unanimity was required with respect to the mitigating evidence.

---

[45] The Attorney General asserts defendant forfeited these claims by failing to object in the trial court to the asserted lack of parity concerning the instructions. Because defendant's contentions raise issues concerning his substantial rights, we address them despite his failure to object below. (§ 1259.)

### 6. *Failure to instruct concerning the presumption of a life sentence*

Defendant contends the absence of an instruction that there is a presumption that life imprisonment without the possibility of parole is the appropriate sentence violated his rights to due process of law, to equal protection of the laws, to a reliable determination of the penalty, and to be free of cruel and unusual punishment, under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.[46]

Defendant acknowledges that we previously have rejected this contention (*People v. Kennedy* (2005) 36 Cal.4th 595, 641 [31 Cal.Rptr.3d 160, 115 P.3d 472]; *People v. Arias* (1996) 13 Cal.4th 92, 191 [51 Cal.Rptr.2d 770, 913 P.2d 980]), but asserts these decisions were wrongly decided. He provides no persuasive reason for us to reconsider these decisions.

### 7. *Asserted cumulative error*

Defendant asserts that errors committed at the guilt phase and the penalty phase, considered cumulatively, require reversal under *Chapman, supra,* 386 U.S. at page 24. Because we have found no error at either phase, there is no error to consider cumulatively.

### 8. *General challenges to California's death penalty scheme*

Defendant raises numerous challenges to the constitutionality of California's death penalty scheme, based upon the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. We have considered and rejected these contentions in prior cases, and discern no reason in the present case to reconsider the conclusions previously reached.

"California's death penalty statute does not fail to narrow the class of offenders who are eligible for the death penalty, as is required by the Eighth Amendment . . . ." (*People v. Salcido* (2008) 44 Cal.4th 93, 166 [79 Cal.Rptr.3d 54, 186 P.3d 437] (*Salcido*); see also *People v. Prince* (2007) 40 Cal.4th 1179, 1298 [57 Cal.Rptr.3d 543, 156 P.3d 1015]; *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1068 [47 Cal.Rptr.3d 467, 140 P.3d 775].)

"Section 190.3, factor (a), which allows the jury to consider '[t]he circumstances of the crime of which the defendant was convicted in the present

---

[46] The Attorney General asserts defendant forfeited his claims by failing to request an instruction concerning the presumption of life imprisonment. Because defendant's contentions raise issues concerning his substantial rights, we address them despite his failure to object below. (§ 1259.)

proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1,' does not violate the Fifth, Sixth, Eighth, or Fourteenth Amendment to the United States Constitution by allowing arbitrary imposition of the death penalty. (*Tuilaepa v. California* (1994) 512 U.S. 967, 975–976 [129 L.Ed.2d 750, 114 S.Ct. 2630]; *People v. Stevens* [(2007)] 41 Cal.4th [182,] 211 [59 Cal.Rptr.3d 196, 158 P.3d 763].)" (*Loker, supra,* 44 Cal.4th at p. 755; see also *People v. Williams* (2008) 43 Cal.4th 584, 648 [75 Cal.Rptr.3d 691, 181 P.3d 1035]; *People v. Alfaro* (2007) 41 Cal.4th 1277, 1330 [63 Cal.Rptr.3d 433, 163 P.3d 118] (*Alfaro*).) "As the United States Supreme Court noted in upholding factor (a) against an Eighth Amendment challenge, 'our capital jurisprudence has established that the sentencer should consider the circumstances of the crime in deciding whether to impose the death penalty. [Citation.]' [Citation.]" (*Page, supra,* 44 Cal.4th at p. 60.)

There is no requirement in the federal or the state Constitution that the jury reach a unanimous agreement with respect to the factors in aggravation, that jurors find the factors in aggravation to be true beyond a reasonable doubt, that the jury find beyond a reasonable doubt that the circumstances in aggravation outweigh those in mitigation before imposing the death penalty, or that the jury find beyond a reasonable doubt that death is the appropriate punishment. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1097 [81 Cal.Rptr.3d 651, 189 P.3d 911] (*Wallace*).) Nor is there a requirement that the jury make written findings. (*Salcido, supra,* 44 Cal.4th at p. 166; *Page, supra,* 44 Cal.4th at p. 60.) "We have repeatedly held that the high court's recent decisions [in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], *Ring v. Arizona* (2000) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], and *Blakeley v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531]] do not compel a different answer. [Citations.]" (*People v. Mendoza* (2007) 42 Cal.4th 686, 707 [68 Cal.Rptr.3d 274, 171 P.3d 2]; see also *Page, supra,* 44 Cal.4th at p. 60; *People v. Lewis* (2008) 43 Cal.4th 415, 421 [75 Cal.Rptr.3d 588, 181 P.3d 947].)

"It is settled . . . that California's death penalty law is not unconstitutional in failing to impose a burden of proof—whether beyond a reasonable doubt or by a preponderance of the evidence—as to the existence of aggravating circumstances, the comparative weight of aggravating and mitigating circumstances, or the appropriateness of a sentence of death. [Citations.]" (*Alfaro, supra,* 41 Cal.4th at p. 1331.) We also have rejected the contention that the jury must be instructed that no party bears the burden of proof on the matter of punishment. (*People v. Dunkle* (2005) 36 Cal.4th 861, 939 [32 Cal.Rptr.3d 23, 116 P.3d 494], disapproved on another ground in *Doolin, supra,* 45 Cal.4th at p. 421, fn. 22.)

"This court's refusal to conduct intercase proportionality review of a death sentence does not violate the federal Constitution. [Citation.]" (*Wallace, supra,* 44 Cal.4th at pp. 1098–1099.)

"Contrary to defendant's claim, the use of unadjudicated criminal activity during the penalty phase is permissible, and does not violate the Fifth, Sixth, Eighth, and Fourteenth Amendments. [Citations.]" (*Loker, supra,* 44 Cal.4th at p. 756.)

"The use of restrictive adjectives, such as 'extreme' and 'substantial,' in the sentencing statute and instructions[,] do not render either unconstitutional. [Citation.]" (*People v. Watson* (2008) 43 Cal.4th 652, 704 [76 Cal.Rptr.3d 208, 182 P.3d 543].)

We have rejected the claim that "the phrase 'whether or not' in section 190.3, factors (d) through (h) and (j) allows the absence of a mitigating factor to be considered as an aggravating circumstance" (*Page, supra,* 44 Cal.4th at p. 61), and the claim that "the failure to instruct that statutory mitigating factors may be considered solely as mitigating precludes a reliable, individualized sentencing determination as required by the Eighth and Fourteenth Amendments. [Citation.]" (*Ibid.*)

Because "capital defendants are not similarly situated to noncapital defendants, the death penalty law does not violate equal protection by denying capital defendants certain procedural rights given to noncapital defendants. [Citations.]" (*People v. Cruz* (2008) 44 Cal.4th 636, 681 [80 Cal.Rptr.3d 126, 187 P.3d 970].)

" 'International law does not compel the elimination of capital punishment in California.' (*People v. Snow* (2003) 30 Cal.4th 43, 127 [132 Cal.Rptr.2d 271, 65 P.3d 749].) Moreover, California does not impose capital punishment as ' "*regular punishment* for substantial numbers of crimes." ' (*People v. Demetrulias* (2006) 39 Cal.4th 1, 43 [45 Cal.Rptr.3d 407, 137 P.3d 229].) 'The death penalty is available only for the crime of first degree murder, and only when a special circumstance is found true; furthermore, administration of the penalty is governed by constitutional and statutory provisions different from those applying to "regular punishment" for felonies. (E.g., Cal. Const., art. VI, § 11; §§ 190.1–190.9, 1239, subd. (b).)' (*Id.* at p. 44.)" (*Doolin, supra,* 45 Cal.4th at pp. 456–457.) "California's status as being in the minority of jurisdictions worldwide that impose capital punishment, especially in contrast with the nations of Western Europe, does not violate the Eighth Amendment. (See, e.g., [*Moon, supra,* 37 Cal.4th at pp.] 47–48 . . . .)" (*People v. Mungia* (2008) 44 Cal.4th 1101, 1143 [81 Cal.Rptr.3d 614].)

### 9. *Challenge to the order of restitution*

Defendant contends the trial court abused its discretion in determining defendant's ability to pay a restitution fine of $10,000 under section 1202.4.

Both the version of section 1202.4 in effect at the time defendant was sentenced in 1998, and the current version, provide that "[i]nability to pay may be considered . . . in increasing the amount of the restitution fine in excess of the two hundred-dollar . . . minimum" (§ 1202.4, subd. (c)), and that "[i]n setting the amount of the fine . . . in excess of the two hundred-dollar . . . minimum, the court shall consider any relevant factors, including, but not limited to, the defendant's inability to pay, the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, the extent to which any other person suffered any losses as a result of the crime, and the number of victims involved in the crime. Those losses may include pecuniary losses to the victim or his or her dependents as well as intangible losses, such as psychological harm caused by the crime. Consideration of a defendant's inability to pay may include his or her future earning capacity. A defendant shall bear the burden of demonstrating his or her inability to pay. Express findings by the court as to the factors bearing on the amount of the fine shall not be required." (§ 1202.4, subd. (d).)

Defendant's argument in the trial court—that the imposition of a large restitution fine, which would be deducted from a portion of any funds given to defendant by his family to purchase personal items such as toothpaste, would be "an additional indignity"—did not establish that imposing the maximum fine of $10,000 would be inappropriate under section 1202.4. On the contrary, his argument contemplated that defendant would have funds in the future from which restitution could be paid, and thus contradicted the view that defendant would be unable to pay the fine. Defendant's theory on appeal—that the trial court disregarded his inability to pay the fine—also fails. The court clearly considered that possibility as a factor, but defendant's assertion that he was unable to pay the fine did not compel the court to impose a lesser fine. In light of the offenses committed by defendant and the harm he caused to the victim and her children, we find no abuse of discretion in the trial court's determination that a fine in the amount of $10,000 was appropriate.

## III.

## CONCLUSION

For the foregoing reasons, we affirm the judgment in its entirety.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied September 9, 2009.